### STORK RESTAURANT, Inc. v. SAHATI et al.

### No. 11657.

Circuit Court of Appeals, Ninth Circuit.
Feb. 18, 1948.

Malone & Sullivan, William M. Malone and Raymond L. Sullivan, all of San Francisco, Cal., for appellant.

Albert Picard, of San Francisco, Cal. (Alfred E. Graziani, of San Francisco, Cal., of counsel), for appellee.

Before GARRECHT, MATHEWS and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

The appellant seeks to enjoin the appellees from using its trade name, "The Stork Club", and its insigne, consisting of a stork standing on one leg and wearing a high hat and a monocle. The complaint likewise asked for damages in the sum of $5,000, but that prayer was waived.

The court below entered judgment denying injunctive relief. From that judgment the present appeal has been taken.

### 1. The Facts

There is no dispute concerning the salient facts of this case. In their brief, the appellees concede that factual statement given in the appellant's opening brief is "substantially correct for the purpose of this appeal."

The appellant owns and operates a cafe and night club at No. 3 East 53d Street, New York, N. Y., known as "The Stork Club", described in a newsreel as "the best and most publicized night club in the entire world". The name had been used in New York by the appellant's two predecessor corporations since 1929.

As found by the court below, the appellant has been operating that establishment since on or about August 15, 1934. The cafe supplies "expensive food, beverages, music and dancing facilities", employs approximately 240 persons, and yields an average annual gross income of more than $1,000,000.

The appellant has spent more than $700,-000 during the past eleven years in adver-

tising on a nation-wide scale. This advertising was conducted through various media, including radio, newspapers, magazines, books, motion pictures, and established mailing lists. Another form of the publicity technique used by the appellant has been "cash advertising"—gifts to customers which included automobiles, 400 radios, one of which is an exhibit in this case; thousand dollar bills, none of which are exhibits here; five hundred dollar bottles of perfume, and "thousands" of thirty-five dollar bottles of perfume. Still another form of promotion has been "house advertising"—food and liquor given away to newspaper people, to radio, stage, and screen celebrities, and to "men in prominent and public life in the industrial world".

Newspapers throughout the country publish articles and photographs relating to the Stork Club. Many of America's leading syndicate writers mention it in their columns. Articles and advertisements relating to it appear in magazines of national circulation, and books have been written about it.

The club has been mentioned in many national hook-up radio programs, such as those of Bing Crosby, Frank Sinatra, Eddie Cantor, Walter Winchell, Jack Benny, Jimmy Durante, and Fred Allen.

A motion picture entitled "The Stork Club", produced by Paramount Pictures at a cost of nearly $1,700,000 and starring Betty Hutton and Barry Fitzgerald, was given 14,457 exhibitions throughout the United States, during a run of fifty-nine weeks, at a rental of $3,018,676.26. In northern California and adjacent territory, that picture was given 532 showings, during a run of sixty weeks, at a rental of $126,588.89. And in San Francisco alone, during a ten-day run at the Fox Theater, it was viewed by 83,729 persons. According to the deposition of George A. Smith, western sales manager for Paramount, one of the reasons for popularity of the picture was that "it had a very salable title, the popularity of the Stork Club was spread all over the United States". The Stork Club was paid $27,500 for the use of its name. Pathe News and "March of Time" have shown scenes from the Stork Club.

Despite the fact that it decided that the appellant was not entitled to an injunction to prevent its trade name from being appropriated by another, the court below did make the following finding of fact:

"By reason of the manner in which plaintiff has been conducting and operating 'The Stork Club', * * * and by reason of the large sums of money expended by plaintiff in advertising and otherwise promoting its said business in the State of New York, the said plaintiff's 'The Stork Club' has acquired a widespread and valuable reputation, and has commanded and now commands patronage from visitors to New York from throughout the United States; during all of the time said business has been conducted, the same has been, and now is patronized by visitors to New York both from in and about the City of New York and from the United States at large, *including the metropolitan area of San Francisco, California; * * * that* by reason of the foregoing, the said business of plaintiff conducted and operated under the name 'The Stork Club' and with the aforesaid insignia used in conjunction therewith, *became and now is known to many persons in and about the City and County of San Francisco * * * as a club in New York.*" (Emphasis supplied.)

On the other hand, the court found that, on or about April 6, 1945, the appellees "began the operation of, and continuously since that date have been operating and conducting a small bar, tavern and cocktail lounge at No. 200 Hyde Street, in * * * San Francisco * * * under the name of 'Stork Club' * * * ." In another finding, the court indicated that a predecessor of the appellees had used the name at that location since March 1, 1943. The establishment has about ten stools at the bar, and will accommodate about fifty persons. It has about four steady employees, and serves only such food as is necessary to "conform with the law regulating the operation of bars." There are a few tables. There is no dancing, although the match pads distributed by the appellee for advertising purposes depict a dancing couple.

The appellees had a pianist "at one time", and when they "took over from the pre-

vious ownership there was a three-piece orchestra that they had on their payroll for probably two years". This orchestra continued with the appellees for about a month after the latter took over. The appellees have displayed a panel, suspended from the marquee and extending all around its three sides, with the word "Entertainment" emblazoned on each of the three sides. Napkins used in the appellee's establishment carried the picture of a stork standing on one leg and wearing a high hat, with the legend, "Stork Club * * * Finest Liquors. Expertly Blended Entertainment [sic]". Nicholas M. Sahati, one of the appellees, testified in this connection: "There might have been a few leftover napkins that the former owners had in the place when we took over, with the picture of a stork, which we used up, but never did order any napkins of that type. * * * I couldn't say exactly, maybe a few dozen. * * * There might have been a larger quantity; I have no method of knowing."

### 2. *The Weight to Be Given to the Findings*

At the threshold of our discussion of the law and the facts of this case, it should be pointed out that the bulk of the testimony was by deposition. In so far as such testimony is concerned, it is well settled that in an equity case "the reviewing court gives slight weight to the findings." Equitable Life Assurance Soc. v. Irelan, 9 Cir., 123 F.2d 462, 464; cf. Smith v. Royal Ins. Co., 9 Cir., 125 F.2d 222, 224, certiorari denied, 316 U.S. 695, 696, 62 S. Ct. 1291, 86 L.Ed. 1765.

In their brief, the appellees repeatedly advert to the fact that "There is not involved in this appeal any question of a registered trade mark". While this statement is undoubtedly true, the appellees can derive little comfort from it.

### 3. *Trade Names and Trademarks Stand on a Similar Footing*

In California and elsewhere, a firmly established trade name receives the same protection from the law as a trade mark. In the recent case of Eastern Columbia, Inc. v. Waldman, 30 Cal.2d 268, 271, 181 P.2d 865, 867, the Supreme Court of California said:

"It is asserted by defendant that an absolute injunction will not be granted for the infringement of the right to use a word in what is called a 'secondary meaning' as distinguished from a technical trademark. Where words have acquired, as is established beyond dispute in this case, a fanciful meaning—a meaning that has no connection with their common meaning, it may be more properly said that such meaning is their primary meaning in so far as their use in business is concerned. Their common meaning has dropped into the background. Otherwise no right to use them to the exclusion of others would have been acquired. *When, however, words have acquired such a sense and are the subject of the good will and reputation of a business which they designate, there is little if anything left to distinguish them from a trademark, a symbol, characters or words which have no common meaning and which are artificial, insofar as the scope of protection afforded to the one who has the prior right.*

"An absolute injunction is proper where defendant's conduct is unlawful. [Authority cited] *The protection afforded trade names which have acquired the status here reached is treated in the same category as trademarks, where it is not necessary that the competitor use the words to describe his product.* [Many cases cited]" (Emphasis supplied.)

See also R. H. Macy & Co., Inc. v. Macys, Inc., D.C.Okl., 39 F.2d 186, 187; Restatement of the Law, torts, vol. 3, pages 562–566.

Accordingly, in the present inquiry it will be helpful to consider decisions dealing with trademarks as well as those concerned simply with trade names.

### 4. *A Trade Name Gives Rise to a Property Right*

Ownership of a trade name is a property right. It is made so by statute in California. Sections 14400, 14401 and 14402 of the Business and Professions Code (Deering, 1944) read as follows:

"§ 14400. *Ownership.* Any person who has first adopted and used a trade name,

whether within or beyond the limits of this State, is its original owner.

"14401. *Transferability: Protection accorded.* Any trade name may be transferred in the same manner as personal property in connection with the good will of the business in which it is used or the part thereof to which it is appurtenant, and the owner is entitled to the same protection by suits at law or in equity.

"14402. *Remedy for violation of rights.* Any court of competent jurisdiction may restrain, by injunction, any use of trade names in violation of the rights defined in this chapter."

In Eastern Columbia, Inc. v. Waldman, supra, 30 Cal.2d at pages 269 and 270, 181 P.2d at page 866, the state Supreme Court recited that "plaintiff has used the trade name 'Eastern Columbia' and acquired property rights and good will therein," and that "The findings establish that the plaintiff owns the trade name of 'Eastern Columbia' ".[1]

The California rule accords with general law. In Siegel Co. v. Federal Trade Commission, 327 U.S. 608, 612, 66 S.Ct. 758, 760, 90 L.Ed. 888, Mr. Justice Douglas referred to trade names as "valuable business assets" and adverted to "the policy of the law to protect them as assets of a business", citing Federal Trade Commission v. Royal Milling Co., 288 U.S. 212, 217, 53 S.Ct. 335, 77 L.Ed. 706.[2]

### 5. *Where the Trade Name Embodies the Corporate Title*

The property right in a trade name will be recognized perhaps even more readily when, as here, it embodies the distinctive part of the owner's corporate name. In American Steel Foundries v. Robertson, 269 U.S. 372, 46 S.Ct. 160, 162, 70 L.Ed. 317, the court said: "The general doctrine is that equity not only will enjoin the appropriation and use of a trade-mark or trade-name, where it is completely identical with the name of the corporation, but will enjoin such appropriation and use where the resemblance is so close as to be likely to produce confusion as to such identity, to the injury of the corporation to which the name belongs." [Cases cited.]

In an oft-cited case not referred to in the briefs, Standard Oil Co. of New Mexico v. Standard Oil Co. of California, 10 Cir., 56 F.2d 973, 977, 978, the court used the following language:

"A corporate name is in the nature of a property right. [Many cases cited]

"By the prior lawful entry into a field under a legally adopted name, and by prior appropriation and use thereof, a corporation acquires a right to such name which the law will recognize and protect. [Many cases cited]

\*　　\*　　\*　　\*　　\*　　\*

"A corporation may establish its corporate name as a trade name; it may build up a fine reputation for the high quality of its products, for financial responsibility, and for business integrity and fair dealing in the field within which it transacts its business.

\*　　\*　　\*　　\*　　\*　　\*

"A corporate name or trade name identifies a corporation; it also identifies its business and the goods or services which it sells or renders."

### 6. *The Law of Unfair Competition is Broader Than the Law of Trademarks*

The appellant, however, does not bottom its complaint solely upon the appellees' alleged violation of its property right in the trade name "The Stork Club". It also alleges that the appellees have been guilty of unfair competition by using the "confusingly similar" name, "Stork Club", and related insigne of a stork standing on one leg and wearing a high hat.

---

[1] See also Evans v. Shockley, 58 Cal. App. 427, 431, 209 P. 42; Hall v. Holstrom, 106 Cal.App. 563, 568, 289 P. 668 petition for hearing denied by the state Supreme Court; Hoover Company v. Groger, 12 Cal.App.2d 417, 419, 55 P.2d 529; Jackman v. Mau, 78 Cal.App.2d 234, 237, 239, 177 P.2d 599.

[2] See also Beech-Nut Packing Co. v. P. Lorillard Co., 273 U.S. 629, 632, 47 S.Ct. 481, 71 L.Ed. 810; Coca-Cola Co. v. Old Dominion Beverage Corporation, 4 Cir., 271 F. 600, 604, certiorari denied, 256 U.S. 703, 41 S.Ct. 624, 65 L.Ed. 1179; Rhea v. Bacon, 5 Cir., 87 F.2d 976, 977; R. H. Macy & Co., Inc. v. Macys, Inc., supra, D.C., 39 F.2d 186, at page 187.

■ Before attempting to evaluate this phase of the appellant's case, it will be well to bear in mind that the reach of the law of unfair competition is greater than that of the law of trademarks.

In Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 412, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713, the court said:

"Courts afford redress or relief upon the ground that a party has a valuable interest in the good will of his trade or business, and in the trademarks adopted to maintain and extend it. The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another. [Cases cited.]

"This essential element is the same in trademark cases as in cases of unfair competition unaccompanied with trade-mark infringement. In fact, the common law of trademarks is but a part of the broader law of unfair competition. [Cases cited.]

"Common-law trademarks, and the right to their exclusive use, are, of course, to be classed among property rights. ([In re] Trade-Mark Cases, 100 U.S. 82, 92, 93, 25 L.Ed. 550, 551); but only in the sense that a man's right to the continued enjoyment of his trade reputation and the good will that flows from it, free from unwarranted interference by others, is a property right, for the protection of which a trademark is an instrumentality. As was said in the same case ([100 U.S. 82], at page 94 [25 L.Ed. 550]), the right grows out of use, not mere adoption."

The principle was recognized by this court in Phillips v. Governor & Co., etc. 9 Cir., 79 F.2d 971, 974.[3]

### 7. Direct or "Market" Competition is Not An Essential Ingredient of Unfair Competition

■ The appellees insist that, because of their "most humble field of operation" they cannot be considered to be in competition with the appellant, whose place "is of the highest". Since they are not in competition *at all,* obviously—so runs their argument—they cannot be in *unfair* competition with the appellant. Plausible as this contention may seem, it does not correctly state the law.

In Academy of Motion Picture Arts and Sciences v. Benson, 15 Cal.2d 685, 691, 692, 104 P.2d 650, 653, hereinafter referred to as "the motion picture case", the Supreme Court of California, after an exhaustive review of the authorities, said: ."The case before us may be novel, but it does not follow that the plaintiff may not be entitled to some relief. In calling attention to the novelty of the facts in American Philatelic Society v. Claibourne, 3 Cal.2d 689, 46 P. 2d 135, 140, this court said: 'It is also to be borne in mind that the rules of unfair competition are based not alone upon the protection of a property right existing in the complainants, but also upon the right of the public to protection from fraud and deceit.' * * * *And it does not appear necessary that the parties be in competitive businesses * * *."[4]*

The modern general law on this subject was trenchantly epitomized by Judge Learned Hand in the leading case of Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972, 973, 974:

"The law of unfair trade comes down very nearly to this—as judges have repeated again and again—that one merchant shall not divert customers from another by representing what he sells as emanating from the second. This has been, and perhaps even more now is, the whole Law and the Prophets on the subject, though it assumes many guises. Therefore it was at first a debatable point whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold. How could he lose bargains which he had no means to fill? What harm did it do a chewing gum maker to have an ironmonger use his trade-mark? The law often ignores the nicer sensibilities.

"However, it has of recent years been

---

[3] See also United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141; American Steel Foundries v. Robertson, supra, 269 U.S. 372, at page 380, 46 S.Ct. 160, 70 L.Ed. 317; Restatement, id., at page 537.

[4] See also Wood v. Peffer, 55 Cal.App. 2d 116, 122, 123, 130 P.2d 220; Jackman v. Mau, supra, 78 Cal.App.2d at pages 241, 242, 177 P.2d 599.

recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful. [Cases cited.]"

A very recent statement of the doctrine is to be found in Hanson v. Triangle Publications, 8 Cir., 1947, 163 F.2d 74, 78, certiorari denied 68 S.Ct. 387: "* * * there can be unfair competition although the businesses involved are not directly competitive. Under present general law, the use of another's mark or name, even in a noncompetitive field, where the object of the user is to trade on the other's reputation and good will, *or where that necessarily will be the result,* may constitute unfair competition. [Cases cited.]" (Emphasis supplied.)[5]

### 8. A "Fanciful" Trade Name is Especially Protected

"The Stork Club" is a trade name that, in the language of the books, might well be described as "odd", "fanciful", "strange", and "truly arbitrary". It is in no way descriptive of the appellant's night club, for in its primary significance it would denote a club for storks. Nor is it likely that the sophisticates who are its most publicized customers are particularly interested in the stork.

It is not a trade name that would naturally suggest itself for a fashionable restaurant. "Elbow Room", the name adopted by one of the predecessors of the appellees, would have been more appropriate. so would "Stagger Inn", or even "Filling Station".

In other words, there is little likelihood that the appellant's predecessors and the appellees' predecessor hit upon the names "The Stork Club" and "Stork Club", respectively, as acts of independent creation. It seems a clear case of a junior appropriator's seeking to capitalize on the prestige of the senior, of which more hereafter.

Equity gives a greater degree of protection to "fanciful" trade names than it accords to names in common use.

In Arrow Distilleries v. Globe Brewing Co., 4 Cir., 117 F.2d 347, 351, the court said: "* * * the rule that coined or fanciful marks or names should be given a much broader degree of protection than words in common use is sound, for it recognizes not only the orthodox basis of the law of trade-marks that the sale of the goods of one manufacturer or vendor as those of another should be prevented, but also the fact that in modern business the trade-mark performs the added function of an advertising device, whose value may be injured or destroyed unless protected by the courts."[6]

When, as here, an insigne accompanies the "coined" trade name, there is even greater need for safeguarding the public as well as the senior appropriator from imi-

[5] See also Horlick's Malted Milk Corporation v. Horluck's, Inc., 9 Cir., 59 F.2d 13, 15; Phillips v. Governor & Co. etc., supra, 9 Cir., 79 F.2d 971, at page 974; Beech-Nut Packing Co. v. P. Lorillard Co., 3 Cir., 7 F.2d 967, 970, affirmed, 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810, supra; Standard Oil Co. of New Mexico v. Standard Oil Co. of California, supra, 10 Cir., 56 F.2d 973, at pages 977 and 978; Lady Esther, Limited v. Flanzbaum, D.C.R.I., 44 F.Supp. 666, 669; Bamberger Broadcasting Service v. Orloff, D.C.N.Y., 44 F.Supp. 904,

907; and Acme Chemical Co. v. Dobkin, D.C.Pa., 68 F.Supp. 601, 613, 614, which contains an exhaustive summary of decisions relating to the various phases of the law of unfair competition.

[6] See also Hall v. Holstrom, supra, 106 Cal.App. 563, at page 568, 289 P. 668; Sweet Sixteen Co. v. Sweet "16" Shop, 8 Cir., 15 F.2d 920, 925; Standard Oil Co. v. California Peach & Fig Growers, D.C.Del., 28 F.2d 283, 285; Bulova Watch Co. v. Stolzberg, D.C.Mass., 69 F. Supp. 543, 546.

tations. Rhea v. Bacon, supra, 5 Cir., 87 F.2d at page 977.

### 9. The Effect of Advertising

■ The amount of advertising that the senior appropriator has given to his trade name is another element that the courts will take into consideration in determining whether he is entitled to redress against a junior appropriator.

In Lady Esther, Limited, v. Flanzbaum, supra, D.C., 44 F.Supp. at pages 668, 669, the court carefully itemized the advertising outlay of the complainant, and found that it totaled more than a million dollars a year for six years. In granting the complainant an injunction, the court observed:

"The trade name 'Lady Esther' is fanciful. The complainant has spent large sums of money in advertising to build up goodwill and to make its trade-name and products known to the purchasing public. The complainant used the trade-name for about twenty-nine years before the respondent adopted it in his business.

"Assuming that the respondent adopted the trade-name 'Lady Esther' because, as his son testified, it was the nickname of his son's wife and the adoption was made in good faith, I do not believe that it can be charged to coincidence that the respondent adopted practically the same script on his advertising signs and on his products as the complainant used in its trade-mark on its products." [7]

The name "Stork Club" has acquired its high publicity value not because of its inherent felicity but as a result of the high-powered promotional methods of the New York café. The value of the designation is wholly adventitious, brought about by continued, expensive, and spectacular advertising—such as the giving away of one thousand dollar bills. The conclusion is inescapable that the appellees are seeking to capitalize on the publicity that the appellant has built around the name.

### 10. "Confusion of Source".

■ We reach now what is perhaps the controlling principle in the instant case—that of "confusion of source", with its corollary, "dilution of good-will". This doctrine has been adumbrated in the excerpts from some of the decisions that we have already quoted: a direct inquiry into the problem is now in order.

In a situation where there is no direct competition between the parties, confusion of source may be defined as a misleading of the public by the imitation of "An attractive, reputable trade-mark or trade-name * * * not for the purpose of diverting trade from the person having the trade-mark or trade name to the imitator, but rather for the purpose of securing for the imitator's goods some of the good-will, advertising and sales stimulation of the trade-mark or trade name". Restatement, Id., at page 597.

"One's interest in a trade-mark or trade name came to be protected, therefore, not only on competing goods, but on goods so related in the market to those on which the trade-mark or trade name is used that the good or ill repute of the one type of goods is likely to be visited upon the other. Thus one's interest in a trade-mark or trade name is protected against being subjected to the hazards of another's business." Restatement, Id., at pages 597-598.

The doctrine is well recognized in California. In the motion picture case, supra, 15 Cal.2d at page 689, 104 P.2d at page 652, the Supreme Court of the State said: "The decisions of the courts for the most part are concerned with the principles applicable to infringement and unfair competition in respect to businesses which are directly competitive. But we perceive no distinction which, as a matter of law, should be made because of the fact that the plaintiff and the defendant are engaged in non-competing businesses. In situations involving the use of proper surnames in non-competitive businesses it has been held that *where confusion was shown as likely to result the relief should be accorded to the complaining party*. [Cases cited] Likewise it has been said that 'without regard as to whether there is actual market

---

[7] See also R. H. Macy & Co., Inc. v. Colorado Clothing Mfg. Co., 10 Cir., 68 F.2d 690, 692; Esquire, Inc. v. Esquire Bar, D.C.Fla., 37 F.Supp. 875, 876; Lou Schneider, Inc. v. Carl Gutman & Co., D.C.N.Y., 69 F.Supp. 392, 393, 395.

competition between the parties for the same trade, it is sufficient if the unfair practices of the one will injure the other.'" (Emphasis supplied.)

Again, in Winfield v. Charles, 77 Cal. App.2d 64, 70, 175 P.2d 69, 74, the court reached the very heart of the problem when it observed: "Plaintiff has established a reputation for reliability and meritorious products. If articles which are not produced by him are attributed to him or associated with his name, the injury is obvious."

The rule has been repeatedly expounded by this and other Federal courts.[8]

*(a) "Reaping Where One Has Not Sown".*

█ The decisions frequently refer to this sort of imitation as "reaping where one has not sown" or as "riding the coattails" of a senior appropriator of a trade name.

By whatever name it is called, equity frowns upon such business methods, and in proper cases will grant an injunction to the rightful user of the trade name.

In Aetna Casualty & Surety Co. v. Aetna Auto Finance, Inc., 5 Cir., 123 F.2d 582, 584, certiorari denied, 315 U.S. 824, 62 S. Ct. 917, 86 L.Ed. 1220, the court used the following language:

"This purpose is to project itself into that business arena panoplied in a name already favorable known, rather than to come into it on its own merits, and slowly building, here a little, there a little, establish its own place. * * * [Many cases cited]"

"These cases all hold that where as here it plainly appears that there is a purpose to reap where one has not sown, to gather where one has not planted, to build upon the work and reputation of another, the use of the advertising or trade name or distinguishing mark of another, is in its nature, fraudulent and will be enjoined."

In Cleo Syrup Corporation v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 417, 150 A.L.R. 1056, certiorari denied, 321 U.S. 781, 782, 64 S.Ct. 638, 88 L.Ed. 1074, the court declared that "There is no merit in the contention that a court of equity will not afford protection to the plaintiff's trade-mark or prevent its good will from being nibbled away by unfair competitors."[9]

*(b) A Disparity in the Size of the Respective Businesses Will Not Bar Injunctive Relief*

█ As we have already noted in another connection (Subdivision 7), the appellees stress the fact that, "in comparison to appellant, [they] are in a most humble field of operation".

"Being humble," they continue, "in comparison to appellant this Court can very well deny any relief for unfair competition with appellant."

Humility is no doubt a virtue in many instances, but in a case of this type it affords no defense to a suit for an injunction against infringement of a trade name.

In Hall v. Holstrom, supra, 106 Cal.App. at page 570, 289 P. at page 672, the court stated: "There is no merit in respondent's contention that equity will afford no relief because plaintiff's original place of business was a lunch counter rather than a restuarant. Both are operated for the purpose of preparing and selling food to satisfy hunger. The respective names indicate only a difference in the magnitude of the business rather than a distinction in the character thereof."

In Garcia v. Garcia, D.C. Wis., 197 F.

8 Del Monte Special Food Co. v. California Packing Corporation, 9 Cir., 34 F.2d 774, 775; Horlick's Malted Milk Corporation v. Horluck's, Inc., supra, 9 Cir., 59 F.2d 13, at page 15; Standard Oil Co. v. California Peach & Fig Growers, supra, D.C., 28 F.2d 283, at page 285; R. H. Macy & Co., Inc., v. Macys, Inc., supra, D.C., 39 F.2d 186, at page 187.

9 See also Wall v. Rolls-Royce of America, Inc., 3 Cir., 4 F.2d 333, 334; Buckspan v. Hudson's Bay Co., 5 Cir., 22 F.2d 721, 723, certiorari denied, 276 U.S. 628, 48 S.Ct. 321, 72 L.Ed. 739; R. H. Macy & Co., Inc., v. Macy's Drug Store, Inc., 3 Cir., 84 F.2d 387, 388; Acme Chemical Co. v. Dobkin, supra, D.C., 68 F. Supp. 601, at page 614; Lou Schneider, Inc. v. Carl Gutman & Co., supra, D.C., 69 F.Supp. 392, at page 395; Bulova Watch Co. v. Stolzberg, supra, D.C., 69 F.Supp. at page 547 ("riding the coattails of the plaintiff's good will").

637, 641, it was said: "* * * the defendant's claim that his annual product is so small as not to make him a competitor of the complainants cannot be urged as supporting a right to use complainants' valuable trade-names as a means, possibly, to extend his business. If complainants have the right to stop the use of such names, they can exercise it regardless of the extent of defendant's business."

*(c) Mere Geographical Distance Does Not Obviate Danger of Confusion*

█ The court found that, because of its business methods and its extensive publicity, the appellant's establishment, "conducted and operated under the name 'The Stork Club' and with the aforesaid insignia used in conjunction therewith, became and now is known to many persons in and about * * * San Francisco, * * * as a club in New York"; and that it "is patronized by visitors to New York * * * from * * * the metropolitan area of San Francisco * * *."

In these days of chain restaurants, one would not have to be uncommonly naive to assume that even a "humble" cafe at Turk and Hyde Streets, San Francisco, might be an unpretentious branch of a glittering New York night spot. A branch unit is usually less elaborate and impressive than the "mother house". As we shall see in a moment, however, equity will protect even the uncommonly naive against deception from unfair competition.

In any event, mere geographical distance is not of itself sufficient to preclude the possibility that a given establishment is a branch of an enterprise having its principal place of business elsewhere.

This principle is well established in California, where, as we have seen, it is provided by statute that "Any person who has first adopted and used a trade name, whether within or beyond the limits of this State, is its original owner," and "is entitled to

the same protection by suits at law or in equity." Business and Professions Code, §§ 14400 and 14401, supra.

In the early case of Derringer v. Plate, 29 Cal. 292, 295, 296, 87 Am.Dec. 170, the Supreme Court of the State, thus expressed the rule:

"The right is not limited in its enjoyment by territorial bounds, but subject only to such statutory regulations as may be properly made concerning the use and enjoyment of other property, or the evidences of title to the same; the proprietor may assert and maintain his property right wherever the common law affords remedies for wrongs. The manufacturer at Philadelphia who has adopted and uses a trade mark, has the same right of property in it *at New York* or *San Francisco* that he has at his place of manufacture." (Emphasis supplied.)

The doctrine has been followed in California to the present day. In the recent case of Winfield v. Charles, supra, 77 Cal. App.2d at page 71, 175 P.2d at page 74 the court said: "Furthermore, in the interest of fair dealing courts of equity will protect the person first in the field doing business under a given name to the extent necessary to prevent deceit and fraud upon his business and upon the public. For this purpose the second in the field may be enjoined from using the name, *even though the principal places of business are at a considerable distance from each other.*" (Emphasis supplied.) [10]

The same rule has prevailed in the Federal Courts.[11]

*(d) As to False Statements Obviously False*

█ During the oral argument, it was suggested that any one driving by an unpretentious night club displaying the sign "Stork Club" in or near San Francisco, would hardly assume that the place was in any way affiliated with the celebrated New

---

[10] See also Benioff v. Benioff, 64 Cal. App. 745, 748, 222 P. 835; Hall v. Holstrom, supra, 106 Cal.App. 563, at pages 569, 570, 289 P. 668.

[11] Buckspan v. Hudson's Bay Co., supra, 5 Cir., 22 F.2d 721, at page 723; Rhea v. Bacon, supra, 5 Cir., 87 F.2d 976, at page 977; White Tower System v. White Castle System, etc., 6 Cir., 90 F.2d 67, 69, certiorari denied, 302 U.S. 720, 58 S.Ct. 41, 82 L.Ed. 556; The Governor, etc., Trading into Hudson's Bay v. Hudson Bay Fur Co., D.C.Minn., 33 F.2d 801, 802; Brass Rail, Inc. v. Ye Brass Rail of Massachusetts, Inc., D.C. Mass., 43 F.Supp. 671, 672.

York establishment. It may well be true that a prudent and worldly-wise passerby would not be so deceived. The law, however, protects not only the intelligent, the experienced, and the astute. It safeguards from deception also the ignorant, the inexperienced, and the gullible.

That is the teaching of the Supreme Court of the United States, and it has been followed in this and in other circuits.

In Federal Trade Commission v. Standard Education Society, 302 U.S 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141, the court said:

"The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the suspicious. The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of caveat emptor should not be replied upon to reward fraud and deception.

"* * * To fail to prohibit such evil practices would be to elevate deception in business and give to it the standing and dignity of truth."

Another classical statement of the rule is to be found in Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73, 75: "The law is not made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearance and general impressions." [12]

*11. Actual Loss of Trade Need Not be Shown to Warrant an Injunction.*

The appellees stress the fact that the appellant has failed to show "that appellees' operation in any way has injured appellant," etc.

Neither under the California jurisprudence nor under the general law is such showing necessary. The California decisions, indeed, are overwhelmingly in accord on this point.

In the motion picture case, supra, 15 Cal. 2d at pages 691, 692, 104 P.2d at page 653, the Supreme Court of the State thus enunciated the rule: "And it does not appear necessary that the parties be in competitive businesses or that the injury has already occurred. It is sufficient if the names, although not identical, are sufficiently similar to cause confusion and injury. [Cases cited.]"

And in the recent case of Winfield v. Charles, supra, 77 Cal.App.2d at page 70, 175 P.2d at page 73, we find the following succinct statement: "It is unnecessary, in such an action, to show that any person has been confused or deceived. It is the likelihood of deception which the remedy may be invoked to prevent." [13]

This is undoubtedly the Federal rule. In Adolph Kastor & Bros. v. Federal Trade Commission, 2 Cir., 138 F.2d 824, 826, the court thus summarized the doctrine: "No one need expose his reputation to the trade practices of another, even though he can show no pecuniary loss." [14]

---

[12] See also Stanley Laboratories v. Federal Trade Commission, 9 Cir., 138 F.2d 388, 392, 393; D.D.D. Corporation v. Federal Trade Commission, 7 Cir., 125 F.2d 679, 681; Aronberg v. Federal Trade Commission, 7 Cir., 132 F.2d 165, 167; Charles of the Ritz Distributors Corporation v. Federal Trade Commission, 2 Cir., 143 F.2d 676, 679, 680; Dorfman v. Federal Trade Commission, 8 Cir., 144 F.2d 737, 739; A. P. W. Paper Co. v. Federal Trade Commission, 2 Cir., 149 F.2d 424, 426, affirmed, 328 U.S. 193, 66 S.Ct. 932, 90 L.Ed. 1165; Gulf Oil Corporation v. Federal Trade Commission, 5 Cir., 150 F.2d 106, 109; Parker Pen Co. v. Federal Trade Commission, 7 Cir., 159 F.2d 509, 511.

[13] See also Hall v. Holstrom, supra, 106 Cal.App. 563, at page 572, 289 P. 668; Hoover Co. v. Groger, supra, 12 Cal. App.2d 417, at page 419, 55 P.2d 529; Law v. Crist, 41 Cal.App.2d 862, 865, 866, 107 P.2d 953; California Prune & Apricot Growers' Ass'n v. H. R. Nicholson Co., 69 Cal.App.2d 207, 219, 158 P.2d 764.

[14] See also Standard Oil Co. of New Mexico v. Standard Oil Co. of California, supra, 10 Cir., 56 F.2d 973, at page 976; Acme Chemical Co. v. Dobkins, supra, D.C., 68 F.Supp. 601, at page 614. Cf.

12. *Fraudulent Intent Is Not an Essential Element of Actionable Infringement.*

The appellees assert that the appellant has not shown that they "adopted the name Stork Club with the intention of trading upon or obtaining the advantages of the reputation of appellant's restaurant," etc. It should be pointed out, however, that Nicholas M. Sahati, one of the appellees, who admitted on the witness stand that he was "the guiding spirit" of the family partnership when it took over the San Francisco establishment in question, testified twice that he had heard of the New York cafe at that time. He hastened to add, however, that he "had no idea of what it embraced or was like".

Be that as it may, a lack of fraudulent intent in the junior appropriation of a trade name will not defeat the senior appropriator's right to an injunction.

In Hoover Co. v. Groger, supra, 12 Cal. App.2d at page 419, 55 P.2d at page 530, the court said: "It is the policy of the law to protect the business of the first person to enter the field doing business under a given name to the extent necessary to prevent fraud upon his business and upon the public. [Cases cited] A second to enter the field may be enjoined from the improper use of the name established by the first to enter the field. [Cases cited] *It is not necessary for the plaintiff to prove fraudulent intent.* The defendants may be enjoined if the natural consequence of their conduct is such as to cause deception." (Emphasis supplied)

In The Governor, etc., Trading into Hudson Bay v. Hudson Bay Fur Co., supra, D. C., 33 F.2d at page 803, the court said: "A deliberate attempt to deceive, however, is not a necessary element of such cases. Federal Trade Commission v. Balme, 2 Cir., 23 F.2d 615, 621."

An excellent exposition of the rationale of the rule is to be found in the Restatement, Id., at page 565:

"The normal inference that the defendant's imitation was fraudulent where the plaintiff's mark was *distinctive* came to be a general presumption and finally hardened into a 'conclusive presumption', *which in effect is a rule of law that fraud is unnecessary.* Moreover, regardless of the defendant's initial purpose of knowledge, *an injunction for the future was* deemed appropriate because continuance of the imitation after the notice acquired in the suit would be tantamount to 'fraud'. Law, concerned with the actor's liability for his past conduct looked to his past knowledge and purpose. Equity, concerned with the propriety of the actor's *future* conduct, looked to his present knowledge and to the probable results of his future conduct. The substance of this differentiation still remains. *The actor may be enjoined for the future despite the fact that he adopted and used his designation in ignorance of the other's trade-mark.* * * *

"A trade name is, however, no less effective than a trade-mark as a means of identification. Whether a designation identifies the goods of one person is a question of fact necessary to be answered in determining whether the designation is a trade name. When that determination is made, *there is no more reason for a requirement of 'fraud' in the trade name cases than in the trade-mark cases.*" (Emphasis supplied.)

As was said by the Supreme Court in Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 81, 54 S.Ct. 315, 321, 78 L.Ed. 655: "Indeed there is a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the product of misrepresentation, however innocently made. [Cases cited] That is the respondents' plight today, no matter what their motives may have been when they began. They must extricate themselves from it by purging their business methods of a capacity to deceive."[15]

For the same reason, it does not avail the appellees to urge that the evidence

---

Kroll Bros. Co. v. Rolls-Royce, 126 F. 2d 495, 498, 29 C.C.P.A.(Patents) 897; Cleo Syrup Corporation v. Coca-Cola Co., supra, 8 Cir., 139 F.2d 416, at page 418.

[15] See also D.D.D. Corporation v. Federal Trade Commission, supra, 7 Cir., 125 F.2d 679, at page 682.

showed that they "purchased the said business sometime after it had been known and called by the previous owners the 'Stork Club'." The language of the court in Garcia v. Garcia, supra, D.C., 197 F. at page 641, is apposite here: "The contention of the defendant that the name 'Garcia Brothers' was used by his predecessors cannot avail in defending this suit. There is no showing of a superior right in his predecessors as against the complainants; in fact, the evidence quite clearly shows that the defendant's predecessors were in no better position than is the defendant. If they used such name at all, they began its use long after the complainants had manufactured cigars which had become known under the name of 'Garcia Bros.' as complainants' cigars."

### 13. The Appellees Had an "Infinity" of Other Names From Which to Make Their Selection

▆ There is no need for the appellees to appropriate the appellant's "fanciful" or "arbitrary" trade name. As was said by the Supreme Court of California in Eastern Columbia, Inc., v. Waldman, supra, 30 Cal.2d at page 270, 181 P.2d at page 867: "Under these circumstances it is difficult to find any justification for permitting defendant to use those words at all in his business whether alone or in conjunction with other words. There is no commercial necessity for him to use them. They are not necessary to describe his business or the products he sells such as there might be if they had other than a fanciful meaning with no geographic significance."

This thought that a newcomer has an "infinity" of other names to choose from without infringing upon a senior appropriation runs through the decisions like a leitmotiv.

In Florence Mfg. Co. v. J. C. Dowd & Co., supra, 2 Cir., 178 F. at page 75, we find a classical statement of the principle: "It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them."

And in Coca-Cola Co. v. Old Dominion Beverage Corporation, supra, 4 Cir., 271 F. at page 604: "Plaintiff's rights are limited at the most to two words. All the rest of infinity is open to defendant. It will be safe if it puts behind it the temptation to use in any fashion that which belongs to the plaintiff. It has not done so voluntarily, and compulsion must be applied."[16]

### 14. The Question of Formal Demand

▆ The court found that the appellant "has not caused a demand to be made upon said defendants that said defendants desist and discontinue the use of said trade name 'Stork Club' ", and that the appellant "has not heretofore caused a demand to be made upon said defendants that said defendants desist or discontinue the use of said trade name, 'Stork Club' or the aforesaid related insignia". We do not believe that the exhibits or the appellees' pleaded admissions support these findings.

Although the appellees do not mention in their brief this asserted lack of formal demand, the point requires some attention.

Among the exhibits in this case are carbon copies of two letters signed by the appellant's attorneys, the first of which contains a formal demand that the appellees discontinue the use of the name "The Stork Club" and related insigne in connection with the appellees' establishment. The second letter is in the nature of a "follow-up". Each letter is addressed to "The Stork Club, 200 Hyde Street, San Francisco, California," and the second is marked for the "Attention" of the appellees.

The first letter is dated May 4, 1945, and the second, May 15, 1945. In their verified answer, the appellees "admit that on or

---

16 See also Standard Oil Co. of New Mexico v. Standard Oil Co. of California, supra, 10 Cir., 56 F.2d 973, at page 980; The Governor, etc., Trading into Hudson Bay v. Hudson Bay Fur Co., supra, D.C., 33 F.2d 801, at page 803; Bulova Watch Co. v. Stolzberg, supra, D.C., 69 F.Supp. 543, at page 547.

about April 6, 1945, they became the operators of and ever since have operated and conducted" the San Francisco bar here in question. The lower court so found.

Nicholas M. Sahati testified that on May 4, 1945, the appellees' address was 410 Loew Building, San Francisco, but that on May 15, 1945, it was at 200 Hyde Street, where the appellees' bar is situated. He later testified, however, that he and his associates were not in possession of the Hyde Street premises at the latter date. He had previously testified that the appellees had the "actual ownership but not actual possession" of the premises on April 6, 1945, and had been receiving a percentage of the profits since March 15, 1945. The record shows that the "onsale" beer and wine and distilled spirits licenses were issued to the appellees on April 6, 1945; that a sales tax permit was issued to them on March 16, 1945, and that the last date for which their predecessor paid a sales tax to the State of California was April 11, 1945.

While Sahati testified that he did not receive either of the letters in question, there is no evidence that none of the other appellees received them. Notice to one partner is notice to all. Sweet Sixteen Co. v. Sweet "16" Shop, supra, 8 Cir., 15 F.2d 920, at page 924.

■■■ Teresa Gilligan, the secretary for one of the appellant's attorneys, testified that she typed, addressed, stamped, and mailed each of the letters in question. The addresses on the envelopes corresponded with the addresses on the letters themselves. The envelopes contained return addresses.

Section 1963 of the California Code of Civil Procedure provides in part as follows:

"§ 1963. [Disputable presumptions.] All other presumptions are satisfactory, if uncontradicted. They are denominated disputable presumptions, and may be controverted by other evidence. The following are of that kind:

*　　*　　*　　*　　*　　*

"24. That a letter duly directed and mailed was received in the regular course of the mail."

From all the evidence in this case, both oral and documentary, and from the legal consequences flowing therefrom, we believe that one or more of the members of the Sahati partnership did receive one or both of the letters to which we have referred.

■■■ Furthermore, we do not believe that a formal demand is requisite in a suit of this type. As we have seen, "regardless of the defendant's initial purpose *or knowledge,* an injunction *for the future* was deemed appropriate because continuance of the imitation after the notice acquired in the suit would be tantamount to 'fraud'." Restatement, Id., at page 565. [Emphasis supplied.] Indeed, even if the appellees admittedly had received the demand, and had ceased using the "Stork Club" name as a result thereof, an injunction might well have been granted in this case: "As a means of establishing and vindicating the plaintiff's right, an injunction may issue even though the defendant ceases his wrongful conduct. Thus, if the defendant disputes the plaintiff's right, an injunction is proper, despite the cessation of the infringing conduct, in order to adjudicate the wrongful quality of that conduct and to protect the plaintiff against its resumption, which, in view of the dispute, may be likely. Similarly, if the defendant engages in his conduct with knowledge of the plaintiff's interest, cessation of the conduct upon notice from the plaintiff or upon the bringing of the action does not make an injunction unnecessary, for resumption of the conduct thereafter is not unlikely." Restatement, Id., at page 632.

Therefore, there being no necessity for a demand, equity, which looks to the substance and not to the form, will not make a demand a prerequisite to the granting of injunctive relief in a case of this kind.

*15. Laches Is No Defense in a Suit of This Nature*

■■■ On the subject of laches, the court below found as follows: "The name 'Stork Club' has been used * * * at 200 Hyde Street by the defendants herein and by the predecessor in interest of said defendants * * * at all times since the 1st day of March, 1943, and that the said name was

publicly and openly displayed on said premises, and that the said plaintiff has been guilty of laches and delay in taking no action of any kind or character whatsoever against said defendants or the predecessor * * * for the period of three (3) years from the first use of said name in said premises."

The undisputed evidence, however, shows the following:

As we have seen, the appellant's attorneys mailed formal demands to the appellees on May 4, 1945, and May 15, 1945, or a little more than two years after the date on which the court found the name was first used in connection with the San Francisco café, and about one month after the appellees took over. The complaint in the instant case was filed on February 25, 1946, or within ten months from the time the formal demands were mailed.

Considering that the infringing establishment was a "humble" café 3,000 miles from the night club of the senior appropriator of the name, we do not believe that the foregoing lapses of time constitute laches.

We do not labor the point, however, because we hold that in a case of this type laches is no defense.

In Hall v. Holstrom, supra, 106 Cal.App. at pages 570, 571, 289 P. at page 672, the court said:

"Where the public has not been misled or deceived to its damage by the delay in instituting an action for infringement against the use of a trade-mark or design, mere laches will not furnish a defense. In Hopkins on Trade-Marks, (4th Ed.) p. 206, § 89, it is said:

" 'By the recent decision of the Supreme Court in the case of McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828, it was held that acquiescence of long standing was no bar to an injunction (for infringement of a trade-mark.)'

"So, also, in 38 Cyc., page 881, it is said:

" 'In suits for unfair competition or infringement it is well settled that mere

laches in the sense of delay to bring suit does not constitute a defense. Such laches may, under some circumstances, bar an accounting for past profits, but under no circumstances will it bar an injunction against a further continuance of the wrong. Laches or delay must be accompanied by circumstances amounting to an abandonment or an estoppel before it constitutes any defense. Mere delay and silence, although with knowledge of infringement, does not amount to consent and is no bar to relief against a continuance of the infringement.' Nolan Bros. Shoe Co. v. Nolan, 131 Cal. 271, 63 P. 480, 53 L.R.A. 384, 82 Am.St. Rep. 346; Nims on Trade-Marks, p. 1025, § 413."[17]

The Federal rule is in accord with the California view. In McLean v. Fleming, 96 U.S. 245, 257, 258, 24 L.Ed. 828, the court said:

"Cases frequently arise where a court of equity will refuse the prayer of the complainant for an account of gains and profits, on ground of delay in asserting his rights, *even when the facts proved render it proper to grant an injunction to prevent future infringement.* [Authorities cited.]

"Relief of the kind is constantly refused, even where the right of the party to an injunction is acknowledged because of an infringement, as in case of acquiescence or want of fraudulent intent. [Many authorities cited.]

"Acquiescence of long standing is proved in this case, and *inexcusable laches* in seeking redress, which show beyond all doubt that the complainant was not entitled to an account nor to a decree for gains or profits; *but infringement having been proven, showing that the injunction was properly ordered,* he is entitled to the costs in the Circuit Court; * * *." (Emphasis supplied.) [18]

### 16. Conclusion

Up to this point, we have refrained from citing two district court de-

---

17 See also Schmidt v. Brieg, 100 Cal. 672, 681, 682, 35 P. 623, 22 L.R.A. 790.

18 See also Phillips v. Governor & Co., etc., supra, 9 Cir., 79 F.2d 971, at page 974, quoting Menendez v. Holt, 128 U.S. 514, 523, 524, 9 S.Ct. 143, 32 L.Ed. 526.

cisions that are particularly applicable to the instant case. So apposite are they, indeed, that to have referred to them under each of the appropriate foregoing subheadings would have been burdensome and repetitious. For this reason we are mentioning them generally at the close of our discussion, with the comment that only a complete reading of the two opinions will bring an adequate appreciation of their applicability to the case at bar. We refer to Brooks Bros. v. Brooks Clothing of California, Limited, D.C.Cal., 60 F.Supp. 442, adopted and affirmed by this court, 158 F. 2d 798, certiorari denied, 331 U.S. 824, 67 S.Ct. 1315; and Stork Restaurant, Inc. v. Marcus, D.C.Pa., 36 F.Supp. 90, 92, 95, in which the present appellant was awarded an injunction restraining the defendant Marcus who had *registered* "with the proper Pennsylvania authorities * * * as proprietor of a restaurant business under the fictitious name 'The Stork Club' located at" Philadelphia, from using that trade name and an insigne that was "similar, though not identical" to that used by the appellant herein.

The appellant is not here seeking to have the appellees mulcted in damages, nor is it striving to drive them out of business. It asks merely that its adversaries be compelled to desist from an unfair trade practice that threatens to "nibble away", "whittle away", or "dilute" the value of its dearly-bought prestige.

The appellant begs that the appellees, with an "infinity" of other names to choose from, divest themselves of plumage borrowed from the Stork.

In a word, the appellant is making a plea peculiarly calculated to move the conscience of a chancellor. It prays not for a sword, but for a shield.

The judgment is reversed, and the case is remanded to the lower court, with directions to grant to the appellant an injunction as prayed for in the complaint.