SWEET SIXTEEN CO. v. SWEET "16" SHOP, Inc., et al.

(Circuit Court of Appeals, Eighth Circuit. November 17, 1926.)

No. 7234.

1. Trade-marks and trade-names and unfair competition ⟨⟩59(1)—Use of name Sweet "16" Shop in business in Utah similar to that of California corporation using name "Sweet Sixteen Company" and expanding territory to include Utah held infringement.

Use of name Sweet "16" Shop, Inc., in carrying on business in Utah similar to that of California corporation using trade-name of Sweet Sixteen Company, and having expanded business by including Utah as territory by catalogues and advertisements *held* to constitute infringement.

2. Trade-marks and trade-names and unfair competition ⟨⟩53—Essence of wrong in infringement of trade-marks is sale and mistaking of goods of one dealer for those of another.

In case of infringement of technical or common-law trade-marks the essence of the wrong is sale and mistaking of goods of one dealer or manufacturer for those of another.

3. Trade-marks and trade-names and unfair competition ⟨⟩31—Generally, though first appropriator and user of trade-mark owns mark and will be protected against subsequent users, protection will not be afforded against subsequent user in good faith using mark in different territory.

Generally, while first appropriator and user of trade-mark is entitled to protection by courts in use thereof against subsequent users on same class of goods, such protection will not be afforded against subsequent user and appropriator in good faith adopting and using mark in territory into which goods of first appropriator had not penetrated.

4. Partnership ⟨⟩159—Notice to one partner is notice to other.

Notice to one partner constitutes notice to the other.

5. Trade-marks and trade-names and unfair competition ⟨⟩53—Quantum of user of technical trade-mark in trade in disputed territory need not be large to constitute infringement.

Although, to constitute infringement of technical trade-marks, there must have been some user in trade in disputed territory, quantum thereof need not be large.

Appeal from the District Court of the United States for the District of Utah; Joseph W. Woodrough, Judge.

Action by the Sweet Sixteen Company against the Sweet "16" Shop, Inc., and others. Decree for defendants, and plaintiff appeals. Reversed and remanded, with directions.

Sloss & Ackerman, of San Francisco, Cal., for appellant.

Stewart, Alexander & Budge, of Salt Lake City, Utah, for appellees.

Before LEWIS, Circuit Judge, and MUNGER and FARIS, District Judges.

FARIS, District Judge. This is an action in equity for an injunction and an accounting, based on the alleged infringement of plaintiff's trade-mark and trade-name. The decree below went for defendant, and plaintiff appealed in conventional mode.

While numerous errors are assigned, there is, in the last analysis, but one question presented upon the record. That question is whether, upon the facts shown by the evidence, which were practically undisputed, plaintiff was entitled to the relief prayed for. Mere inspection and pronunciation disclose that the names of plaintiff and defendant are so similar as to bespeak infringement, if (a) plaintiff, the conceded prior user of the mark and name involved, and defendant, when defendant set up its business, came into actual competition in the same field or territory of trade, or (b) if defendant, when it began business, knowingly assumed plaintiff's name and mark in a contiguous field of trade, or territory into which plaintiff had already penetrated with its trade to an extent, and into which plaintiff must soon go extensively by the natural expansion of its business.

[1] There is but little dispute about the controlling cases which announce the law. Largely, both sides rely upon the same cases and authorities. The solution of the case depends upon the application of the practically undisputed evidence to these controlling cases, which situation renders necessary a brief statement of the facts shown upon the trial. The record is long, but the salient facts are fairly simple and not involved. They run thus: In the year 1916, plaintiff began business in San Francisco, as a dealer in women's ready-to-wear clothing, under the name of Sweet Sixteen Company, a corporation. In its business and advertisements

it referred to many of its garments and goods as "Sweet Sixteens," it designated its system of dealing as the "Sweet Sixteen System," and it sold many of the garments kept for sale by it at $16 per garment. In the beginning it had but one store. It prospered in such wise as that, by the year 1921, it was the owner of five stores, two in San Francisco, and the others in three other cities of the coast states, namely, Los Angeles, Portland and Seattle, as also an office and general purchasing agency in New York. It was advertising its business in divers trade journals and in the daily newspapers of the several cities in which its stores were located. Some 75 of these newspapers were daily sold and read in Utah. Its annual advertising expenditures in the year last mentioned exceeded $30,000, and in the year in which this suit was begun, amounted to more than $120,000. It had a very considerable mail order business, through which it sold some goods in some 12 or 15 different states, among which was the state of Utah. While the business done thus in the state of Utah was, in proportion to its total business, negligible, it was making efforts to increase it, and to this end, in the year 1921, it sent same 1,500 of its printed catalogues into that state. In the year 1922 it supplemented this selling and advertising campaign in the state of Utah by distributing therein pictures and drawings of many of the articles kept by it for sale.

Prior to 1923, and about the year 1921, it put on foot tentative plans to rent and establish a store in Salt Lake City, Utah. These plans were not consummated, however, up to April 3, 1923, when defendant started in Salt Lake City a wholly similar business, (save that it does not particularly cater to the mail order business), dealing in like merchandise, which defendant ran and operated under the name of the Sweet "16" Shop, Inc. Defendant was incorporated in the state of Utah on the 17th day of May, 1923. Prior to such incorporation, and on April 3, 1923, defendants Provol and Wrigley procured the issuance to them, as copartners, of a certificate of trade-mark from the secretary of state of the state of Utah, carrying the designation "Sweet '16' Shop." Some four days prior to the issuance of this certificate, and a like period before defendants Provol and Wrigley began business, Provol, one of the copartners, was advised by wire from plaintiff of the existence of plaintiff corporation and was warned not to use the name "Sweet 16" in defendants' business. Thereupon defendants took legal advice as to their right to use this name. While this advice was favorable to them, there is left no question in the case that defendants assumed this name with full knowledge of its use by plaintiff, if such fact shall be of controlling importance.

[2] The record discloses fairly numerous instances wherein dealers, customers, and potential customers were misled by the similarity of names into mistaking defendants' business for that of plaintiff. It is well settled that, both in cases of unfair competition unaccompanied with trade-mark infringement, and in cases of infringement of technical or common-law trade-marks, the essence of the wrong consists in the sale or mistaking of the goods of one dealer or manufacturer for those of another, and that this essential element is the same in both classes of cases. "In fact, the common law of trade-marks is but a part of the broader law of unfair competition." Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713.

Much difficulty has been encountered, and much confusion is created on the record, by the bill of complaint, the nature and the contents of the evidence, and the briefs of counsel, touching whether this action is intended to be bottomed on the infringement of a technical or common-law trade-mark and a trade-name, or whether it is bottomed on that specific branch of unfair competition arising from palming off by defendants, through their course of action, name and dealings of their goods as the goods of the plaintiff. The pleadings, the evidence, and the briefs carry implications that it is bottomed on the infringement of a trade-mark and trade-name created by prior use, as well as unfair competition, arising from the name and manner of dealing of the defendants. Casually it seems to fall into that category of redressable wrongs arising from the alleged piracy and use of plaintiff's trade-mark and trade-name by the defendant, the latter of which is, more accurately speaking, a branch of unfair competition. But since, as seen, there is no difference in the essential test of guilt, and since both parties agree touching that test, nomenclature is perhaps unimportant.

This we deem to be so, because, as said, both largely rely on the same cases to sustain their respective contentions. These cases are Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713, and United Drug Co. v. Rectanus Co., 248 U. S. 90, 39 S. Ct. 48, 63 L. Ed. 141. Both sides agree, as they needs must, that the two

above cases announce the law which is decisively to be applied to some of the facts. They disagree as to whether these facts show either (a) that plaintiff had entered the Salt Lake City field of trade before defendant took and used plaintiff's trade-mark and trade-name therein; or (b) that the disputed territory, in and about Salt Lake City, is within the natural field of plaintiff's legitimate trade expansion. In fairness it may be said that defendant does not concede, as a matter of law, either that plaintiff is entitled to a field of trade for natural business expansion, or that the doctrine of the cases it relies on leaves such a field open to plaintiff.

Before the cases of Hanover Star Milling Co. v. Wheeler Co. and United Drug Co. v. Rectanus, both supra, were decided, much confusion is to be found and much diversity of opinion existed among the courts which dealt with the points which are here decisive. The above cases crystallized the law, and prior learning, so far as the federal courts are concerned, becomes of negligible value. The one decisive question here, broadly stated, is whether, on the facts, this case is within the rule announced in the above cases, or within the exceptions which plaintiff insists are clearly noted in these cases.

The brief and salient facts in the Rectanus Case are that, about the year 1877, Mrs. Regis began to use the word "Rex" as a trade-mark for certain medicinal preparations made by her in Haverhill, Mass. Thereafter, through mesne assignments and continued use, this trade-mark came, about the year 1911, into the hands of the United Drug Company. During all of the years between 1877 and 1911 the sales of this medicinal preparation were confined to the New England states, with inconsiderable sales in New York, New Jersey, Canada, and Nova Scotia. In the meantime, and in the year 1889, one Rectanus, familiarly known as "Rex," began at Louisville, Ky., to use the word "Rex" as a trade-mark for another sort of medicinal preparation, which he sold and advertised in Kentucky. In 1912 the United Drug Company for the first time extended the sale of its medicines, bearing its "Rex" trade-mark, into the state of Kentucky. When it did so, and prior thereto, it had notice that the assignee of Rectanus was using the identical trade-mark in Kentucky on its medicines. These facts and all of them notwithstanding the United Drug Company sued the Rectanus Company for the infringement of its trade-mark. In the Supreme Court the decree went for defendant; the court saying, among other things, this:

"Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question. See Delaware & H. Canal Co. v. Clark, 13 Wall. 311, 323, 20 L. Ed. 581; McLean v. Fleming, 96 U. S. 245, 251, 24 L. Ed. 828; Amoskeag Manufacturing Co. v. Trainer, 101 U. S. 51, 53, 25 L. Ed. 993; Columbia Mill Co. v. Alcorn, 150 U. S. 460, 463, 14 S. Ct. 151, 37 L. Ed. 1144. But the reason is that purchasers have come to understand the mark as indicating the origin of the wares, so that its use by a second producer amounts to an attempt to sell his goods as those of his competitor. The reason for the rule does not extend to a case where the same trade-mark happens to be employed simultaneously by two manufacturers, in different markets separate and remote from each other, so that the mark means one thing in one market, an entirely different thing in another. It would be a perversion of the rule of priority to give it such an application in our broadly extended country that an innocent party, who had in good faith employed a trade-mark in one state, and by the use of it had built up a trade there, being the first appropriator in that jurisdiction, might afterwards be prevented from using it, with consequent injury to his trade and good will, at the instance of one who theretofore had employed the same mark, but only in other and remote jurisdictions, upon the ground that its first employment happened to antedate that of the first-mentioned trader. * * *

"The same point was involved in Hanover Milling Co. v. Metcalf, 240 U. S. 403, 415, 36 S. Ct. 357, 60 L. Ed. 713, where we said: 'In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question. But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant, unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods to forestall the extension of his trade, or the like.'

"In this case, as already remarked, there is no suggestion of a sinister purpose on the part of Rectanus or the Rectanus Company; hence the passage quoted correctly defines the status of the parties prior to the time when they came into competition in the Kentucky

market. And it results, as a necessary inference from what we have said, that petitioner, being the newcomer in that market, must enter it subject to whatever rights had previously been acquired there in good faith by the Rectanus Company and its predecessor. To hold otherwise—to require Rectanus to retire from the field upon the entry of Mrs. Regis' successor—would be to establish the right of the latter as a right in gross, and to extend it to territory wholly remote from the furthest reach of the trade to which it was annexed, with the effect not merely of depriving Rectanus of the benefit of the good will resulting from his long-continued use of the mark in Louisville and vicinity, and his substantial expenditures in building up his trade, but of enabling petitioner to reap substantial benefit from the publicity that Rectanus has thus given to the mark in that locality, and of confusing if not misleading the public as to the origin of goods thereafter sold in Louisville under the Rex mark, for, in that market, until petitioner entered it, 'Rex' meant the Rectanus product, not that of Regis."

[3] The facts in the case of Allen & Wheeler Co. v. Hanover Star Milling Co., sub nomine Hanover Milling Co. v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713, are very similar to those in the Rectanus Case, supra. In the Metcalf Case, Allen & Wheeler Company had first adopted and used the trademark "Tea Rose," on a certain sort of flour made by it, and which it sold wholly in that part of the United States north of the Ohio river; "while the Hanover Company had adopted 'Tea Rose' as its mark in perfect good faith with no knowledge that anybody else was using or had used those words in such a connection, and during many years it had built up and extended its trade in the southeastern territory, comprising Georgia, Florida, Alabama, and Mississippi, so that in the flour trade in that territory the mark 'Tea Rose' had come to mean the Hanover Company's flour and nothing else." The Circuit Court of Appeals held, and the Supreme Court concurred substantially in the holding, "that the right to protection in the exclusive use of a trade-mark extends only to those markets where the trader's goods have become known and identified by his use of the mark; and because of the nonoccupancy by the Allen & Wheeler Company of the Southeastern markets it had no ground of relief in equity." It need scarcely be added that the alleged infringement, above complained of, occurred in the "Southeastern markets."

Confessedly, then, the general rule is that, while the first appropriator and user of a trade-mark owns such mark and is entitled to protection by the courts in the use thereof, against subsequent users on the same class of goods, such protection will not be afforded as against a subsequent user and appropriator, who in good faith adopts and uses the mark in territory into which the goods of the first appropriator have not penetrated and have not been used or sold. Hanover Milling Co. v. Metcalf, supra; United Drug Co. v. Rectanus Co., supra. As already forecast, appellant frankly concedes the general rule to be substantially as stated, but it urges that the instant case falls upon the facts within the exceptions held in mind by the Supreme Court, when it used in the Metcalf Case this language:

"But cases differ according to their circumstances, and neither of those cited is in point with the present. Allowing to the Allen & Wheeler firm and corporation the utmost that the proofs disclose in their favor they have confined their use of the 'Tea Rose' trade-mark to a limited territory, leaving the Southeastern states untouched. Even if they did not know—and it does not appear that they did know—that the Hanover Company was doing so, they must be held to have taken the risk that some innocent party might, during their 40 years of inactivity, hit upon the same mark and expend money and effort in building up a trade in flour under it. If, during the long period that has elapsed since the last specified sale of Allen & Wheeler 'Tea Rose'—this was 'in the later 70's'—that flour has been sold in other parts of the United States, excluding the Southeastern states, no clearer evidence of abandonment by nonuser of trade-mark rights in the latter field could reasonably be asked for. And when it appears, as it does, that the Hanover Company in good faith and without notice of the Allen & Wheeler mark has expended much money and effort in building up its trade in the Southeastern market, so that 'Tea Rose' there means Hanover Company's flour, and nothing else, the Allen & Wheeler Company is estopped to assert trade-mark infringement as to that territory.

"The extent and character of that territory, and its remoteness from that in which the Allen & Wheeler mark is known, are circumstances to be considered. Alabama alone—to say nothing of the other states in question—has an area of over 50,000 square miles, and by the census of 1910 contained a population of more than 2,000,000. Its most

northerly point is more than 250 miles south of Cincinnɔti, which is the nearest point at which sales of Allen & Wheeler 'Tea Rose' are shown to have been made, and these at a time antedating by approximately 40 years the commencement of the present controversy. We are not dealing with a case where the junior appropriator of a trade-mark is occupying territory that would probably be reached by the prior user in the natural expansion of his trade, and need pass no judgment upon such a case. Under the circumstances that are here presented, to permit the Allen & Wheeler Company to use the mark in Alabama, to the exclusion of the Hanover Company, would take the trade and good will of the latter company—built up at much expense and without notice of the former's rights—and confer it upon the former, to the complete perversion of the proper theory of trade-mark rights."

More concretely stated, the exceptions to the general rule, which appellant contends differentiate on the facts the case at bar from both the Metcalf Case and the Rectanus Case, are found in this language in the above quoted excerpts from these two opinions:

(a) "But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant, *unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like.*" (Italics ours.) United Drug Co. v. Rectanus Co., 248 U. S. loc. cit. 101, 39 S. Ct. 52 (63 L. Ed. 141).

(b) "*We are not dealing with a case where the junior appropriator of a trade-mark is occupying territory that would probably be reached by the prior user in the natural expansion of his trade, and need pass no judgment upon such a case.*" (Italics ours.) Hanover Milling Co. v. Metcalf, 240 U. S. loc. cit. 420, 36 S. Ct. 363 [60 L. Ed. 713].

[4] In the instant case defendants Provol and Wrigley, while they were copartners, before they organized defendant corporation and before they actually began business, had notice of plaintiff's prior adoption, appropriation, and use of the words "Sweet Sixteen" to designate its business, and as a trade-mark on the goods in which plaintiff was dealing. The trial court so found, and the facts in evidence conclusively so disclose. Not only is this conclusively shown by the telegram sent to Provol, notice to whom as a partner was notice to Wrigley (20 R. C. L. 355), but it is corroborated by other evidence in the case, some of which is suggestive, if not sinister. For example, they saw fit to make a slight change in the manner of representing the expression "Sixteen" by the use of quoted numerals, instead of spelling the word out, as plaintiff does; before they began business, and before they had ever actually used this mark, they registered it as a trade-mark with the secretary of state of Utah. Aside from the finding of the trial court, and of the conclusive evidence of prior notice, the two latter precautions are such as would not ordinarily be taken by those who were wholly innocent of plaintiff's existence and of its use of the mark in controversy.

Apposite to the exception of prior appropriation of the field of trade and of the right to a natural expansion into such field, the facts, as already said, are that plaintiff in 1921, and some two years before defendant began business under the style complained of here, had sent some 1,500 of its catalogues into Utah and to Salt Lake City; in 1922 it supplemented these catalogues by sending into that state pictures and drawings of many of the goods kept and sold by it; and it had sold to citizens of Utah at Salt Lake City some goods and had filled some mail orders there; in all, making some six or eight sales in one or the other of the above ways. Newspapers containing its advertisements had constantly been sold in Salt Lake City for a number of years before defendants did the act here complained of. Plaintiff avers, and the evidence discloses, its intention to establish a store in Utah, and to this end it had already taken tentative steps till the acts of defendants forestalled it.

We think that these things, and others which appear of record and might be mentioned, clearly distinguish this case, upon the undisputed facts, from the cases relied on by defendants. We are clearly of the opinion that it falls, on such undisputed facts, without the general rule of the Rectanus Case and the Metcalf Case, and that it is within the exceptions stated in the above cases. Not only, we repeat, are we of the opinion that the instant case is within what seem to be the very plain exceptions to the general rule as pointed out in the above cases, but that the above facts of notice of prior use, the quantum of such use, the solicitation of trade, and the advertisements of plaintiff in the Salt Lake City territory of trade, bring the case within settled rules not at all disturbed by the above-cited leading cases.

For we are dealing here with a trade-mark clearly within the category of odd and fanciful marks, and not with a mark within the public domain, in which latter the user required must be such, and so long and so expansively used, as to acquire a secondary meaning.

In a case then like the instant one, the rule laid down in the very excellent and able work of Mr. Nims, seems yet applicable:

"In considering the question of extent of use, careful distinction must be drawn between technical and pure trade-marks and marks which are not technical, but are in the public domain. Where the name or device chosen is fanciful and may become a technical trade-mark, very slight use will, in addition to adoption create a trade-mark. Where the name or device is in the public domain, the whole question of use lies in pais. It differs with every case and to make out a cause of action, the complainant must show that the name or mark he is claiming as his commercial signature has now come to possess a meaning or signification in addition to its general or public meaning or signification, which new or secondary meaning is identical in the public mind only with him and his business." Nims, The Law of Unfair Competition and Trade-Marks, 415.

[5] Obviously, the trade-marks under discussion in the Hanover and Rectanus Cases were likewise technical trade-marks, but in neither of the latter cases had there been any sales, advertisements of goods, or user whatever by complainants therein in the territory there in controversy. In case of a technical trade-mark as here dealt with, while there must, of course, be some user in trade in the disputed field of trade, the quantum thereof need not be large. Nims, The Law of Unfair Competition and Trade-Marks, supra; Kathreiner's Malzkaffee Fab. v. Pastor Kneipp Medicine Co., 82 F. 321, 27 C. C. A. 351; Ansehl v. Williams (C. C. A.) 267 F. 9; Wallace & Co. v. Repetti, Inc. (C. C. A.) 266 F. 307; Hall v. Barrows, 32 Law J. Ch. 548; Hopkins on Trade-Marks, 64. In the Case of Kathreiner's Malzkaffee Fab. v. Pastor Kneipp Medicine Co., supra, at page 326 (27 C. C. A. 355), the court said:

"It may be suggested whether, in these days of rapid and constant intercommunication and extended commerce between nations, any narrow line of demarkation should be established, on the one side of which should stand moral wrong with legal liability, and upon the other moral wrong with legal immunity. If, however, the courts of a particular government can, with respect to the subject in hand, take cognizance only of wrongs committed within the geographical boundaries of the country, it is still not necessary, in our judgment, that a trade in an article should be fully established, in the sense that the article be widely known, before the proprietor of its trade-mark or trade-name may be entitled to the protection of equity for the preservation of his rights. Otherwise it might be impossible, with respect to a valuable and desirable article or product of manufacture, designated by a particular brand or in a particular manner, ever to establish a trade. Craft and cunning, discerning the value of the product, and the profit to be acquired, would, at the inception of the business, flood the market with spurious and cheaper articles or preparations of the similitude of the genuine, and strangle the trade in the genuine at its birth. It is enough, we think, if the article with the adopted brand upon it is actually a vendible article in the market, with intent by the proprietor to continue its production and sale. It is not essential that its use has been long continued, or that the article should be widely known, or should have attained great reputation. The wrong done by piracy of the trade-mark is the same in such case as in that of an article of high and general reputation, and of long-continued use. The difference is but one of degree, and in the quantum of injury. A proprietor is entitled to protection from the time of commencing the user of the trade-mark."

From the above cases and authorities, and many others which could be cited, it would seem to follow inevitably, that if "a single instance of user, with accompanying circumstances evidencing an intent to establish the right to a trade-mark" (Hopkins on Trade-marks, supra), be sufficient to establish such right in San Francisco, as against an alleged infringer in that city, then six or eight instances of such use, by sales of trade-marked goods, accompanied by fairly extensive advertisements in certain newspapers circulated and read in Salt Lake City, and the distribution therein of many catalogues ought, ceteris paribus, to be sufficient user, as against a subsequent appropriator, to constitute infringement by the latter in Salt Lake City.

Considering the case as it was presented, and without reference to any other questions, save those mooted in the pleadings, the briefs, and arguments, we are of opinion that the case should be reversed and remanded, with directions to grant to plaintiff the relief for which it prays. Let an order be entered accordingly, with costs to be taxed in favor of appellant.