**SAFEWAY STORES, Inc. v. DUNNELL.**

No. 11806.

United States Court of Appeals
Ninth Circuit.

Jan. 11, 1949.

Rehearing Denied Feb. 24, 1949.

HEALY, Circuit Judge, dissenting.

Mitchell T. Neff, Willard S. Johnston, Orrick, Dahlquist, Neff, Brown & Herrington, all of San Francisco, Cal., for appellant.

Joseph F. Westall, Edward F. Westall and Westall & Westall, all of Los Angeles, and Charles M. Fryer, of San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and HEALY and BONE, Circuit Judges.

DENMAN, Chief Judge.

Appellant, Safeway Stores, Inc., hereinafter called Stores, long user of its corporate name as its trade name, appeals from a judgment of the district court (a) requiring the Commissioner of Patents to grant registration to Dunnell as his trade mark the words "Safe Way", which his application to the Patent Office states he "used * * * for toilet seat covers" and (b) denying to the Stores an injunction against Dunnell and his agents sought in a Stores' counterclaim restraining him from using the words "Safe Way" in the course of his business of selling the toilet

seat covers. Stores did not seek damages for the claimed infringement.

The evidence before the district court was in part of witnesses there and that taken before the Examiner of Interferences in an application of Dunnell filed May 1st, 1942, to the Commissioner of Patents for registration of the words "Safe Way."

Stores opposed the application to the Commissioner of Patents on the ground that it had since 1926 and prior to Dunnell's use of the words "Safe Way" engaged in the business of owning and operating retail grocery stores under the name "Safeway" and that in 1944, when its opposition was heard, it owned and operated approximately 2,500 retail stores doing business as "Safeway" in the following states: Arkansas, Arizona, California, Colorado, District of Columbia, Idaho, Iowa, Kansas, Maryland, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, Oklahoma, Oregon, South Dakota, Texas, Utah, Virginia, Washington, Wyoming.

Stores alleged "The name 'Safeway' is the distinguishing and dominant part of opposer's [Stores'] name. Opposer's name 'Safeway' has been and is now prominently displayed in signs on its stores and places of business, in newspaper advertisements, price tags, gummed tape, cash register receipts, invoices, paper bags, display cards, and other forms of advertising, in such manner and to such an extent that the opposer's name 'Safeway' alone has become associated in the mind of the public with opposer, and the name 'Safeway' by reason of such extensive and continuous use by the opposer over a long period of years has come to mean the opposer, and the public know and identify the opposer by the name 'Safeway' alone. 'Safeway' is a substantial part of the valuable good will of opposer."

And alleged that "The name 'Safeway' claimed by applicant [Dunnell] is identical to the name 'Safeway' owned and in prior use by opposer and used by opposer in connection with the sale of merchandise in various classification, including, particularly, paper products, such as toilet tissue, paper towels, paper napkins. The use by applicant of the name 'Safeway' is likely to cause confusion or mistake in the mind of the public or to deceive purchasers as to the origin of such goods, and thereby cause irreparable damage to the good-will of the opposer's business in connection with which the opposer's name 'Safeway' is extensively used."

And alleged that "On or about August 16, 1939, the predecessor of opposer deposited with the Commissioner of Patents a certified copy of its corporate charter, showing its corporate name 'Safeway Stores, Incorporated,' and received certificate of deposit No. 4220 therefor."

And alleged that "The unauthorized use by the applicant of opposer's name 'Safeway' on goods such as toilet seat covers is likely to cause confusion or mistake in the minds of the purchasers or to deceive purchasers into believing that such goods are in some manner associated with or emanate from this opposer."

And alleged that "The name 'Safeway' sought to be registered by applicant consists merely in the name of the opposer corporation, or the distinctive, dominant portion thereof, not written, printed, impressed or woven in some particular or distinctive manner, or not associated with a portrait of an individual, and is therefore within the prohibition against registration of such name under Section 5(b) of the Act of 1905."

And alleged that "The applicant, Warren W. Dunnell, is not the owner of the trade mark sought to be registered by him, and he was not entitled to the exclusive use thereof at the time of the filing of his application, nor at any other time."

Dunnell's response claimed Stores had lost its right to oppose because it had not brought an injunctive proceeding against Dunnell during the nine years he had used "Safe Way" as a trade mark for his toilet seat covers. The response placed in issue the above allegations of Stores, and particularly alleged that Stores had not sold or distributed in its groceries any toilet seat covers under the name "Safeway" or otherwise, and that no one else had sold such covers to the general public, and that Dunnell had sold them only to large concerns

652

which distributed them to the public using them in their public toilets.

Though Dunnell lays great stress on his claim that he was selling his seat covers only to these large users of them in their public toilets, no such limitation of the use of his claimed trade mark was sought from the patent office. The granting of his petition to the Commissioner of Patents as ordered by the judgment of the district court would have given him a monopoly on the trade mark in their sale to the general public in response to a demand which the evidence, infra, shows already existing and certain to increase.

Voluminous evidence was taken and the Examiner of Interferences found that such products as toilet seat covers "are very closely related to the paper products which opposer [Stores] does sell and that the average consumer might reasonably suppose that a paper toilet seat cover sold under the notation "Safeway" was sponsored and sold by the opposer. Indeed, it appears that applicant [Dunnell] himself is of the opinion that his toilet seat covers might be readily carried and sold by opposer since he has approached opposer in an effort to have opposer sell his goods. Considering all the facts involved herein, therefore, it is the examiner's opinion that in view of the nature of the goods confusion of persons and reputations is reasonably likely," and gave his decision against Dunnell that "Safe Way" was non-registerable. On appeal the Commissioner sustained the Examiner, holding that "Safe Way" as used by Dunnell is "non-registerable" because that "mark constitutes a substantial appropriation of opposer [Stores] corporate name" and finding that "Opposer [Stores] operates a chain of more than two thousand grocery stores, which are scattered through half the States of the Union. In them it sells not only groceries, but all such more or less related items as the public demands. It has been in business for many years, and has come to be widely known merely as 'Safeway'. In fact, it has almost invariably used that word alone as its name. And while it may not be as universally recognized as is Radio Corporation of America, its customers constitute a very considerable portion of the American public," and that,

though as Dunnell contends, Stores "was not dealing in the particular merchandise for which registration was sought; but that fact was held to be immaterial. Moreover, as pointed out by the examiner of interferences, opposer does sell such paper products as toilet tissue and paper towels, which are clearly of the same descriptive properties as applicant's paper toilet seat covers."

The Commissioner further decided that Stores need not have sought to enjoin Dunnell as a condition precedent to opposing the registration.

■ This decision of the Commissioner of Patents presented to the district court, and now to this court, the issue whether the evidence in the patent office proceeding afforded inferences of fact supporting it. The rule established in such cases is that stated by the Supreme Court in Morgan Massachusetts v. Daniels, 153 U.S. 120, 124, 125, 14 S.Ct. 772, 38 L.Ed. 657. There the suit in the circuit court to compel the registration of a patent, which had been denied, was stated to be "something more than a mere appeal [from the Commissioner's decision]. It is an application to the court to set aside the action of one of the executive departments of the government. The one charged with the administration of the patent system had finished its investigations and made its determination with respect to the question of priority of invention. That determination gave to the defendant the exclusive rights of a patentee. A new proceeding is instituted in the courts —a proceeding to set aside the conclusions reached by the administrative department and to give to the plaintiff the rights there awarded to the defendant. It is something in the nature of a suit to set aside a judgment, and as such is not to be sustained by a mere preponderance of evidence * * * Upon principle and authority, therefore, it must be laid down as a rule that where the question decided in the Patent Office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction."

This rule is applicable to trade mark cases. Century Distilling Co. v. Continental Distilling Co., 3 Cir., 106 F.2d 486, 489, certiorari denied. Yale Electric Co. v. Robertson, 2 Cir., 26 F.2d 972 (Cir. 2). It precedes the more general rule regarding the finality of findings of an administrator or administrative body of Dobson v. Commissioner of Internal Revenue, 320 U.S. 489, 498, 64 S.Ct. 239, 88 L.Ed. 248, and succeeding cases.[1]

■ The evidence presented to the Examiner warranted the inference of the vast business of Stores through directly owned stores and through directly owned corporations operating grocery stores in many states, having painted on their wall exposures the word Safeway in block capital letters; that millions of dollars were spent annually advertising their products under that name, including toilet paper, paper towels and sanitary napkins; that it is a matter of general knowledge that such toilet tissue and paper towels are used as toilet seat covers by cleanly persons in public toilets, a fact confirmed in the district court in an exhibit of Dunnell's advertising of his "Safe-Way" toilet seat covers stating, "People dread going into a public toilet. Even though the place is modern and kept immaculately clean there is constant fear of infection * * * Save toilet tissue and towels, eliminate pipe stoppage, do away with littered floors."

This evidence of the substitution of Dunnell's seat covers for toilet tissue and paper towels evidently was not considered by the district court when it set aside the patent office decision that there could be a confusion of origin of Dunnell's goods, stating in its opinion: "From the evidence it is clear to me that there is not the slightest relationship between the merchandise of the defendant and the kind of sanitary service provided by plaintiff."

The Examiner and Commissioner further could infer that though now selling toilet tissue used as such toilet covering, Stores contemplated the probable selling of paper toilet seat covers as such in a rise in the demand for such sanitary articles by individual users. Confirming this is testimony in the district court that another corporation manufactured and sold to retailers for resale to the public a Travel Aid pocket of seat covers since 1926 and another cover since 1940, they being not a large but a continuous item of sale in a field of seat cover business which "hasn't been touched". Exhibit P shows that Dunnell also, under the name "Slide Away," sold his seat covers in "travel aid" packages of ten covers for sale to the public, his advertising stating "Travel Aid Packages for resale by stores prove a popular item for sale to the Traveling Public."

Further, Dunnell, on June 19, 1944, wrote Stores, under the name "Sani-Guard Cover Company", stating, "We are manufacturers of sanitary paper toilet seat covers. Before taking your time with details of a sale proposition, we should like to inquire if you would consider our product for merchandising to the public in your stores?" There was nothing in the letter to indicate the "product" was labelled "Safe Way". On the contrary, Exhibit P showed the packages for individual purchases were under the name "Slide Away". To this Stores replied on June 29, 1944, that "up to the present time we have not approved of such an item for resale in our stores. Should our policy in this regard change at any time in the future we shall be happy to discuss the matter with you".

■ With the burden of proof before the patent office on Dunnell, there is no evidence that any responsible officer or agent of Stores knew of Dunnell's use of Stores' trade mark.[2] None appearing there was questioned in that regard and Dunnell's contention is that his advertising of Safe Way seats was confined to a trade other than that of Stores, and the evidence is that the bulk of it was so confined, and the remainder is not shown to be known to Stores.

It appeared before the Examiner that Dunnell's covers are sold in packages hav-

---

[1] Cf. Daphne Robert's "The New Trade-Mark Manual", p. 95.

[2] Dunnell's brief, in reprehensive violation of our rule 20(f) in a case with such a volume of evidence, has over four pages of claimed facts, without any citation to the pages of the record on which they are shown.

ing on them the words "Safe Way-" with a sketched cover between the words and a hyphen after the word "Way" in block capital letters as printed on Stores' buildings, without other matter identifying them as made by Dunnell or any one else, from which the persons seeing them in public toilets could infer they were made by Stores, the Safeway Company. Exhibits before the district court showed that Dunnell also had advertised, though in no great volume, his covers under the name "Safe-Way" with the hyphen between the two words, without any identifying matter disclosing the maker or vendor but advising prospective buyers to "Inquire Today About Safe Way From Your Jobber", despite which the district court erroneously found that Dunnell "advertised said product * * * only under his fictitious name 'Sani-Guard Sales Company' ".

Dunnell offered evidence that many hundreds of thousands of persons in California using public toilets of his customers have taken his paper seats from their containers hung in the toilets, having on them nothing but the words "Safe Way-" from which the Examiner and Commissioner could make the inference supporting their finding, supra, that the average consumer might reasonably suppose that Dunnell's paper seat cover "was sponsored and sold by the opposer", Stores.

This obvious and common sense inference is but the balancing of the evidence of the effect of what was seen by hundreds of thousands, if not millions, of public toilet users against evidence of a simple statement before them, that of Dunnell's deposition, that "no instance has come to [his] knowledge of anyone mistaking the source of [his] toilet seat covers under the trade mark 'Safe Way' as being opposer's, in this case Safeway Stores Incorporated".

Without any further evidence, the district court, in its finding XII, erroneously finds affirmatively "no one ever confused the source of the toilet seat manufacture, distribution or sponsorship". It is not by such treatment of the evidence that the inferences and findings of the Examiner and Commissioner are overcome by "testimony which in character and amount carries conviction".

The Examiner and Commissioner had before them many registrations of the word "safeway" of which it does not appear that any of the registrants had been or were using that mark in any volume or at all when Stores opposed Dunnell's application. Such use of such registrations was not shown to the Examiner, and no inference adverse to his decision can be drawn.

■ "Safeway" is a coined word not appearing in the dictionary. That others may have used it does not prevent its acquiring a secondary meaning, as the district court states in its finding IX that: "Defendant corporation is owner and operator of a national chain of approximately 2,300 retail grocery stores in twenty-four of the states of the United States. The evidence without dispute shows that the general public identifies these stores under the name 'Safeway'. Much effort and money have been expended to establish the good will of defendant's stores under the name 'Safeway'. Since 1926 defendant has been so engaged in the operation, under the name 'Safeway', of retail grocery stores, and sells [40] therein foods and grocery products, including paper toilet tissue, sanitary napkins, facial tissue, paper cups, paper towels, and paper napkins."

■ The Examiner and Commissioner well could make a similar inference of such a secondary meaning of the word safeway as indicating the origin of Stores' toilet paper and other wares, to be protected as in this circuit's decision in Phillips v. Governor & Co., 9 Cir., 79 F.2d 971, 973.[3] Also they could infer that the word so described the origin of the toilet seat covers and that its use was not confined to a mere description of their sanitary quality.

Finally, it appeared before the district court that Dunnell had denied in his deposition before the Examiner that in 1933, when he began distributing his covers under the name "Safe Way", he had heard or

[3] Academy of Motion Picture Arts & Sciences v. Benson, 1940, 15 Cal.2d 685, 104 P.2d 650; Sweet Sixteen Co. v. Sweet "16" Shop, Inc., 8 Cir.1926, 15 F.2d 920; Bill's Gay Nineties v. Fisher, Sup., 41 N.Y.S.2d 234 (1943); Stork Restaurant v. N. Sahati, et al., 9 Cir., 1948, 166 F.2d 348.

knew of "a grocery business conducted under the name 'Safeway'". However, on the showing that in Los Angeles, where Dunnell then conducted his business, there were in 1933 as many as 320 stores all designated as Safeway stores, his counsel admitted that Dunnell had seen them but did not pay any attention to them. This, although Dunnell used block capital letters Safe Way closely resembling that of Stores —that is to say, Dunnell from the beginning built up his business knowing of the identity of his claimed trade name with Stores' use of it.

A. The decision of the Commissioner of Patents is not overcome by evidence before the district court. It cannot be said that the latter evidence produces the "thorough conviction" of Morgan v. Daniels, supra, overcoming the Examiner's finding that in view of the close relation of Stores' paper products, the users of public toilets supplied with Dunnell's covers might reasonably suppose that such covers, sold under the mark "Safe Way," were sponsored and sold by Stores, and the Commissioner's finding that Dunnell's mark of "Safe Way" "constitutes a substantial appropriation of opposer's [Stores'] corporate name" and the Commissioner's decision that the words "Safe Way" are not registerable.

As found by the district court, the public identifies Stores' 2,300 establishments, using the name "Safeway," as those of Stores' corporate name "Safeway Stores, Inc.," and it appears they were selling toilet tissues, a ware which Dunnell admits in his advertising is used as toilet seat covers. The situation is that described in American Steel Foundries v. Robertson, 269 U.S. 372, 383, 46 S.Ct. 160, 163, 70 L.Ed. 317, "where a single word in the corporate name has become so identified with the particular corporation that, whenever used, it designates to the mind of the public that particular corporation."

The American Foundries case is followed in many of the circuits and the Patent Office. In Holly Moulding Devices v. Esquire, 148 F.2d 355, 32 C.C.P.A., Patents, 935, it was held that the corporate name "Esquire, Inc." precluded the registration of the word "Esquire," though that corporation published only a newspaper while the petitioner sought to use the word on a hamburger moulding machine. We regard Dunnell's use of the words "Safe Way," whether with or without the hyphen, to be a similar appropriation of the word "Safeway" a part of Stores' corporate name "Safeway Stores, Inc."

Other cases are to the same effect: Feldman v. Amos and Andy, 1934, 68 F.2d 746, 21 C.C.P.A., Patents, 823, ("Amos 'N Andy" as trademark for work shirts denied registration on opposition of radio entertainment firm of "Amos and Andy"); Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972, ("Yale" as trademark for flashlights and batteries denied registration on opposition of Yale & Towne Manufacturing Co., a manufacturer of locks); Kroll Bros. Co. v. Rolls-Royce, 1942, 126 F.2d 495, 29 C.C.P.A., Patents, 897, ("Kroll's Royce" as trademark for baby buggies denied registration on opposition of Rolls Royce Company); Safeway Stores, Incorporated v. Safeway Opticians, Inc., 68 U.S. P.Q. 332, Pat.Comm.1946, ("Safeway" as trademark for eyeglasses denied registration on opposition of Safeway Stores, Incorporated); Beechnut Cereal Co. v. Beech-Nut Packing Co., 1921, 51 App.D.C. 5, 273 F. 367, ("Beechnut" as trademark for cereal denied registration on opposition of Beech-Nut Packing Co.)

Under these cases our decision would be the same, even though toilet tissues were not used as toilet seat covers, which Dunnell sought to displace with his seat covers.

The principle of these cases, decided under the Trade Mark Act of February 20, 1905, is now incorporated in the Lanham Act, 15 U.S.C. 1051 et seq., 15 U.S.C.A. § 1051 et seq., which became effective July 1947, after the judgment in the district court and prior to the taking of this appeal and, under section 47(b), 60 Stat. 445, 15 U.S.C.A. § 1051 note, is here applicable. It prohibits registration as a trademark of a mark "which so resembles * * * a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion or mistake or to deceive the purchasers * * *." 15 U.S.

C. § 1052(d), 15 U.S.C.A. § 1052(d). Even though "Safeway" was not appellant's "name" within the literal language of the old statute, as we hold it is, it is plainly appellant's "trade name" within the express language of the Lanham Act.

■ B. Stores is entitled to an injunction against Dunnell's use of the words "Safe Way-" or "Safe-Way" or "Safe Way," without the hyphen.

A paramount consideration in determining this equitable question is Dunnell's appropriation in 1933 of these words and using them in block capital letters, with full knowledge that they then were so used on Stores' 320 stores in Los Angeles, where Dunnell started his toilet seat cover business—a fact he at first denied and then admitted. Dunnell, with his eyes open, thus chose to seek the benefit of Stores' vast expenditures for advertising on the chance that it might prove enjoinable.

Our controlling decision is Stork Restaurant v. Sahati, 9 Cir., 166 F.2d 348, 363, and the cases there cited. That case, reversing the same district court's decision, was decided after the judgment in the district court in the instant case.

We there held that the use of the trade-mark of and name "Stork Club" by a small restaurant in San Francisco could be enjoined by the "Stork Restaurant, Inc.," a New York corporation owning a widely advertised restaurant in New York City. There no real competition in the restaurant business was shown. There, as here, the defendant sought to maintain his burden of proof of laches in the plaintiff. Plaintiff showed the mailing of protesting letters and defendant contested their receipt. We held the contention of absence of protest immaterial, stating " * * * we hold that in a case of this type laches is no defense." We there cited, 166 F.2d, at page 363, as the federal law the statement in McLean v. Fleming, 96 U.S. 245, 257, 24 L.Ed. 828, " 'Acquiescence of long standing is proved in this case, and *inexcusable laches* in seeking redress, which show beyond all doubt that the complainant was not entitled to an account nor to a decree for gains or profits; *but infringement having been proven,*

*showing that the injunction was properly ordered,* he is entitled to the costs in the Circuit Court; * * *.' (Emphasis supplied.)"

■ Nor has Dunnell maintained his burden of proof of an estoppel. Stores' letter to Dunnell of June 29, 1944, supra, shows no encouragement in Dunnell's use of the words "Safe Way" and none of Stores' witnesses or any one else examined to show such encouragement or authority.

Even assuming the absence of any competition of toilet tissues and Dunnell's covers for protection of toilet users, Stores is entitled to its injunction. The principle is well stated in Judge Learned Hand's opinion in Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972, at page 974, "However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful. Aunt Jemima Mills Co. v. Rigney, 2 Cir., 247 F. 407, L.R.A. 1918C, 1039; Akron-Overland v. Willys-Overland, 3 Cir., 273 F. 674, Vogue Co. v. Thompson-Hudson Co., 6 Cir., 300 F. 509; Wall v. Rolls-Royce, 3 Cir., 4 F.2d 333. * * *"

The judgment ordering the registration of the trademark is reversed.

The judgment denying Stores' claim for a permanent injunction against Dunnell's use of the words Safe Way is reversed and the district court ordered to render such an injunction.

HEALY, Circuit Judge (dissenting).

What appellee sought in the patent office and endeavors to effect by his bill in

equity here is the registration of his trademark as applied to his toilet seat covers made of tissue paper. His trademark consists of the words "Safe Way" followed by a dash, with a sketch of a toilet seat cover interposed between the words. The nature and practical limitations of his business are in a high degree peculiar; and an appraisal of the equities requires a more adequate statement of these limitations than I am able to find in the majority opinion.

Appellee first adopted this mark for his seat covers in 1933 and has since continued its use. He does not deal with the public generally, his product being unsuited to such a practice. He does business only with a special class of customers who maintain public rest rooms, namely, railroad and bus companies, gasoline service stations, hotels, office buildings, theaters, and the like. These concerns constitute his clientele. They do not, in their turn, vend or market his product. They place his dispensing cabinets in their public rest rooms where the seat covers, installed in the cabinets in packages of about 100 each, are available without charge to those who desire to make use of them. The record substantially establishes the fact that toilet seat covers are not carried or sold in wholesale or retail stores and are not suitable for sale or distribution in this manner. Appellee learned by investigation and experience that stores, including Safeway, furnish no outlet for such an article. In a word, there is no demand for toilet seat covers on the part of the general public. Appellee advertises his business under the trade name "Sani-Guard Sales Co." in mediums directed only to his special class of customers, and not to stores or to the public.

At the outset of the discussion it should be noted that the law of trade-marks is but a part of the broader law of unfair competition. American Steel Foundries v. Robertson, 269 U.S. 372, 380, 46 S.Ct. 160, 70 L.Ed. 317. And the mere fact that one person has adopted and used a trade-mark on his goods does not prevent the adoption and use of the same trade-mark by others on articles of a different description, there being no property in a trade-mark apart from the business or trade in connection with which it is employed. American Steel Foundries v. Robertson, supra.

The problem that has confronted the courts in trade-mark and unfair competition cases is whether, under the facts of the particular case, there is likelihood of the deception of customers, concretely, whether purchasers or prospective purchasers of an article of merchandise having a trade-mark are likely to buy it in the mistaken belief that it is the merchandise of another since it bears the other's familiar symbol or trade name. The probability of deception is naturally enhanced where the articles are competitive. Even if non-competitive the use of the mark will be restrained or its registration denied if there is likelihood of the purchaser's being misled by it into attributing the article to other than its true source. This, as a study of the underlying facts of the many cases will reveal, has been the preoccupation of the judges. A few of the leading authorities developing the doctrine will be analyzed in a moment, but I desire first to mention the two salient, and I think, insupportable, postulates on which the majority here proceed, namely, (1) the supposedly competitive nature of the products of the parties, and (2) the assumed deception of gratuitous users as being the equivalent of buyer deception.

(1) It needs no words of mine to differentiate between the sanitary role played by appellee's seat cover and the peculiar office designed to be performed by Safeway's toilet paper. Safeway has not argued nor did the patent office find that the one competes with the other; it has remained for my associates to make that finding. Safeway's argument is merely that the two articles have the same "descriptive properties"—an elusive phrase not now found in the statute as revised by the Lanham Act, and one with which the courts and the bar have heretofore wrestled with indifferent success. I prefer the restraint of the patent office and of Safeway to the elastic competitive theory of the majority. One might with equal plausibility find competition between earmuffs and children's mittens.

(2) It is clear on the face of the record that the gratuitous users of appellee's seat covers can not be classified as purchasers or prospective purchasers of seat covers. They are not in the market for such an article. The likelihood, if any, of their being deceived as to the source of the article would seem to be immaterial. Even if material there is no showing of a curious user's ever having thought or assumed that Safeway Stores was the source of appellee's toilet seat cover.

The point in respect of the status of the gratuitous user as distinguished from that of a buyer may require a little further scrutiny, and I turn to a few of the modern trade-mark cases. In Radio Corporation of America v. Rayon Corporation of America, 139 F.2d 833, 31 C.C.P.A., Patents, 803, the Court of Customs and Patent Appeals reversed the decision of the Commissioner favorable to the registration of Rayon Corporation's trade-mark comprising the symbol "R.C.A. Fabric," the initials of which had long been used by the opposer Radio Corporation. The Commissioner, being no doubt imbued with a wholesome respect for the court's decision, rejected appellee's trade-mark on the authority of that holding. It is of more than usual importance, therefore, to understand what facts underlay the Rayon decision. The court, 139 F. 2d at page 837 of the published report, summarized the facts and its own process of reasoning thus: "Appellant is concerned with radios and other radio electrical apparatus. Appellee applies its mark to knitted rayon materials. Both radios and knitted rayon materials are used in homes, and are often bought by the same class of people. Considering the fact that the notation 'RCA' has come to be known by the American public as meaning 'Radio Corporation of America,' it would be very reasonable for purchasers, upon seeing the 'R.C.A.' mark upon knitted rayon materials, to conclude that appellant was engaged in, or was sponsoring, the manufacture of such goods." This holding typifies the present-day philosophy on the subject but I take it to be inadequate authority for the rejection of appellee's trade-mark.

Perhaps the most influential of the precedents is the opinion of Judge Learned Hand, speaking for the Second Circuit, in Yale Electric Corporation v. Robertson, Commissioner, et al., 26 F.2d 972, 973. The equitable bill there was between the Yale Electric Corporation as plaintiff and the Yale & Towne Company as defendant. The former had sought to register its trade-mark applied to flashlights and batteries consisting of the word "Yale" stamped thereon. The mark had long previously been used by Yale & Towne upon many sorts of hardware, especially upon locks and keys, but not on flashlights and batteries. The patent office rejected Yale Electric's application and the Second Circuit held that it was right in so doing. The thing I desire to emphasize is that the products of both these parties were of the sort commonly sold to the general public in hardware and department stores and suitable for display in show cases, possibly side by side. The court said that "the record contains many instances where the defendant's buyers did, or said that they should, suppose the plaintiff's flash-lights to be one of the defendant's products, and it is extremely probable that mistakes will continue unless the practice ceases." It went on to say: "The law of unfair trade comes down very nearly to this—as judges have repeated again and again—that one merchant shall not divert customers from another by representing what he sells as emanating from the second. This has been, and perhaps even more now is, the whole Law and the Prophets on the subject, * * *."

As in the above authorities, all the cases I have been able to examine proceed on the basic fact of the likelihood of the confusion of people who are in the market as buyers. In the present instance, as I have endeavored to point out, appellee's customers are the public service concerns. There is no evidence that they have ever been deceived or that there is any likelihood of their deception, and no claim to that effect is advanced by Safeway or by my associates. Appellee's customers know the source of the seat covers they buy. Who, then, are the purchasers likely to be deceived by ap-

pellee's trademark? So far as the record shows they are non-existent. The mind rejects as fanciful the argument that the casual user of appellee's seat cover in a public rest room is exposed to a species of deception capable of injury to Safeway.

The case here is singularly unlike Stork Restaurant v. Sahati, 9 Cir., 166 F.2d 348, which my brothers regard as controlling. The parties to that suit were in the same line of endeavor. The Stork Club in New York, as everybody knows, had built up a national reputation as a night club. The defendants and their predecessors operated a night spot of sorts of their own at San Francisco where they dispensed drinks and food in a cocktail lounge, tavern and bar, and they advertised and sometimes provided musical entertainment. They flagrantly pirated the name "Stork Club" in a patent effort to attract customers by using this highly advertized name, even going so far as to employ the original Stork Club's well-known insignia of a stork in high hat and monocle. There was no palliative showing and the defendants were without so much as the shadow of a moral or equitable defense. It is true that there are broad generalizations in this court's opinion in the Stork case, as there are in many of the unfair competition cases. Hence I think it is essential that in appraising these authorities we do not lose sight of the basic facts of each, for otherwise the prevailing law on the subject can neither be understood nor rationally and fairly applied.

There is no adequate ground for believing that appellee was in bad faith in the selection of his mark. Bad faith, like fraud generally, is not presumed in the absence of persuasive proof either direct or circumstantial. And unless the court is prepared to accept as all-compelling the single circumstance that prior to 1933 a retail grocery chain had gained some prominence under the name Safeway Stores, and that appellee had seen some of its Los Angeles Stores, we have nothing in this record on which to predicate a charge of deliberate copying. The word "Safeway" may, as my associates suggest, be a coined word, but the two words of appellee's mark are not coined. They are words conjointly used in everyday speech and have been employed together in common parlance since the maturity of the language. Nor is appellee's mark identical with Safeway Stores' trade name. The words "Safe Way" with the representation of a toilet seat cover interposed between them constitute a distinctive mark giving to the eye an impression substantially unlike that given by the single word "Safeway." It comprises a symbol appropriately descriptive of a sanitary method; and I am able to discover in this record no sufficient reason for debarring appellee from the use of the symbol, or from having it registered if he thinks registration helpful. He appears to have traded on nobody's reputation but his own; and there is not the slightest showing that his use of the symbol in his peculiar and praiseworthy enterprise has posed or is likely to pose any threat to the good name or business of Safeway Stores.

Finally, I desire to add a word concerning the court's collateral order directing the entry of an injunction against appellee's continued use of his mark. What I have to say on that subject would seem to require a preface. It does not follow as a matter of course that because the majority feel constrained to deny appellee's prayer for a decree compelling registration that they must perforce grant Safeway's counterclaim for injunctive relief. The two things are not necessarily representative of the two sides of a shield, although they ordinarily would be if the judges felt entirely free to make up their own minds. But the extraordinary emphasis which my brothers here place upon the deference which courts are obliged to pay to the findings of the patent office leads one to suppose that in considerable measure they have had their minds made up for them. What I wish to point out is that in respect of Safeway's cross demand for equitable protection the court is obliged to defer to no views other than its own. On this phase we owe deference solely to the mandate of our own hearts, and appeals to doctrines of administrative finality will not serve. In this aspect of the case it is for the court alone to determine the weight and force of the evidence, to find the facts, and to decide where the equities lie; and it neither

ought nor can evade its responsibility or surrender any measure of its authority.

As concerns the allegations of its counterclaim Safeway has the burden of proof. It must, in order to entitle itself to the relief it seeks, establish its right thereto by a preponderance of the evidence. I think it has not come forward wtih evidence, direct or circumstantial, showing that any unfairness or harm has so far developed from appellee's use of his symbol, nor am I able to find in the record any facts indicative of a likelihood of harm in the future. Should circumstances hereafter change to the extent of creating a genuine condition of unfair competition it will then be time enough for Safeway to ask the interposition of a court of equity.[1]

On the other side it is a certainty that appellee will be seriously hurt if he is enjoined from the use of his mark. Over a period of fifteen years he has labored to build up a reputation for his trade-marked product and has succeeded in establishing for his business a useful if comparatively modest place in the sun. It is to be remembered also that at no time prior to appellee's filing in the patent office in 1942, after nine years of open use and prominent display of his symbol in many hundreds of public places in Safeway's main theatre of operations, did that company make the slightest protest against his use of the symbol. While Safeway claims that it was unaware of the use we are not in the circumstances obliged to credit its assertion. Its silence is a devastating commentary on the merits of its case, but here I speak of it particularly in the sense of laches. While I recognize that the matter of Safeway's laches is of no moment so far as concerns the patent office determination, laches is a matter of vital significance in considering whether Safeway is entitled to injunctive relief. It appears to me that on a balancing of the equities Safeway is not entitled to prevail.

On Petition for Rehearing.

PER CURIAM.

 Dunnell's petition for rehearing contends for the first time that Stores' counterclaim is not within the jurisdiction of the district court because, although the parties are of diverse citizenship, the issue raised as to the $3,000 value of the "matter in controversy" was not supported by the evidence.

We do not agree that jurisdiction is lacking. Assuming, but not deciding, that the matter in controversy is not more than $3,000, the counterclaim arises out of the transactions and occurrences which are the subject matter of Dunnell's complaint. Hence, being within federal equity jurisdiction, it was a "compulsory counterclaim," and Federal Rules of Civil Procedure, rule 13 (a), 28 U.S.C.A., requires "any claim" so arising to be counterclaimed, whatever its amount. Cf. Moore v. New York Cotton Exchange, 270 U.S. 593, 609, 46 S.Ct. 367, 70 L.Ed. 750, 45 A.L.R. 1370; New York Life Insurance Co. v. Kaufman, 9 Cir., 78 F.2d 398, 401; Horwitz v. New York Life Insurance Co., 9 Cir., 80 F.2d 295, 301.

The petition for rehearing is denied.

HEALY, J., dissents.

---

[1] The use of a registered trade-mark may of course be enjoined if its use results in unfair competition. Cf. observation of Judge Hand in Yale Electric Corporation v. Robertson, supra, 26 F.2d at page 974.